**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| EDWARD CAMARGO, JUDITH MANDEL, SIMONE NAZARETH, and BONNIE GOLTZ, on their own behalf and on behalf of a similarly situated class, | |
| Plaintiffs, | Civil Action No. 1:23-cv-02589 |
| v. | Hon. John Robert Blakey |
| ABBVIE, INC., | |
| Defendant. | |

**FIRST AMENDED CLASS ACTION COMPLAINT [CORRECTED]**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.    PARTIES .......................................................................................................... 12

    A.    Plaintiffs ............................................................................................. 12

            1.    Edward Camargo ................................................................... 12

            2.    Judith Mandel ...................................................................... 13

            3.    Simone Nazareth .................................................................. 13

            4.    Bonnie Goltz ......................................................................... 14

    B.    Defendant ........................................................................................... 14

            1.    AbbVie, Inc. .......................................................................... 14

            2.    AbbVie manufactures Humira. .......................................... 15

III.    JURISDICTION AND VENUE .................................................................... 15

IV.    DRUG PRICING IN THE UNITED STATES ............................................. 16

    A.    Entities Involved in Drug Pricing ................................................... 16

    B.    The Drug Payment & Distribution Structure ................................ 17

    C.    List pricing as a Basis for Reimbursement .................................... 19

    D.    Consumer Drug Costs ....................................................................... 21

    E.    AbbVie Aggressively Raised Prices to Meet Revenue Targets ................................. 30

    F.    Executive Compensation Provides Incentives to Raise Prices ................................. 31

    G.    Drug Companies Target the U.S. Market for Higher Prices and Use the Medicare Program to Boost Revenue ................................................................ 32

    H.    AbbVie and Other Drug Companies Use Patient Assistance Programs as a Public Relations Tool to Boost Sales ................................................................ 34

    I.    Research and Manufacturing Costs Do Not Justify Price Increases ....................... 35

    J.    Drug Manufacturer Manipulation of PBM Incentives ............................................ 36

     K.     AbbVie—Humira ....................................................................... 39

V.    EXECUTIVE COMPENSATION CREATED INCENTIVES FOR PRICE
    INCREASES ................................................................................................ 46

VI.    PRICE INCREASES NOT JUSTIFIED BY MANUFACTURING COSTS
    AND ARE OUT OF VARIANCE WITH THE COST OF CONSUMER
    GOODS ....................................................................................................... 48

VII.    IMPACT ON CONSUMERS OF UNFAIR AND UNCONSCIONABLE
    LIST PRICES ............................................................................................. 49

VIII.    TOLLING OF THE STATUTE OF LIMITATIONS ......................................... 50

     A.     Discovery Rule Tolling.................................................................. 50

     B.     Fraudulent Concealment Tolling ................................................ 53

     C.     Estoppel....................................................................................... 53

IX.    CLASS ACTION ALLEGATIONS................................................................. 54

X.    CLAIMS FOR RELIEF ............................................................................... 58

COUNT ONE VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND
    DECEPTIVE BUSINESS PRACTICES ACT 815 ILL. COMP. STAT.
    505/1, *ET SEQ.* (BROUGHT ON BEHALF OF A NATIONWIDE CLASS) ................. 58

COUNT TWO VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES
    AND CONSUMER PROTECTION ACT ALASKA STAT. ANN.
    § 45.50.471, *ET SEQ.* ................................................................................. 61

COUNT THREE VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT
    ARIZ. REV. STAT. ANN. § 44-1521, *ET SEQ.* ...................................................... 62

COUNT FOUR VIOLATION OF THE CALIFORNIA LEGAL REMEDIES ACT
    CAL. CIV. CODE § 1750, *ET SEQ.* ............................................................ 64

COUNT FIVE VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION
    LAW CAL. BUS. & PROF. CODE § 17200, *ET SEQ.* ............................... 65

COUNT SIX VIOLATION OF THE COLORADO CONSUMER PROTECTION
    ACT COLO. REV. STAT. § 6-1-101, *ET SEQ.* ................................................ 66

COUNT SEVEN VIOLATION OF THE CONNECTICUT UNFAIR TRADE
    PRACTICES ACT CONN. GEN. STAT. § 42-110A, *ET SEQ.* ......................................... 68

COUNT EIGHT VIOLATION OF THE DELAWARE CONSUMER FRAUD
ACT DEL. CODE TIT. 6, § 2513, *ET SEQ.* ...................................................... 69

COUNT NINE VIOLATION OF THE FLORIDA UNFAIR AND DECEPTIVE
TRADE PRACTICES ACT FLA. STAT. § 501.201, *ET SEQ.* ............................. 70

COUNT TEN VIOLATION OF THE HAWAII UNFAIR OR DECEPTIVE
TRADE PRACTICES ACT HAW. REV. STAT. §§ 480-1, *ET SEQ.* ............... 72

COUNT ELEVEN VIOLATION OF THE IDAHO CONSUMER PROTECTION
ACT IDAHO CODE ANN. § 48-601, *ET SEQ.* ................................................. 73

COUNT TWELVE VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT 815 ILL. COMP. STAT.
505/1, *ET SEQ.* ..................................................................................................... 74

COUNT THIRTEEN VIOLATION OF THE KANSAS CONSUMER
PROTECTION ACT KAN. STAT. § 50-623, *ET SEQ.* ..................................... 76

COUNT FOURTEEN VIOLATION OF THE LOUISIANA UNFAIR TRADE
PRACTICES AND CONSUMER PROTECTION LAW LA. REV. STAT.
§ 51:1401, *ET SEQ.* ............................................................................................. 77

COUNT FIFTEEN VIOLATION OF THE MARYLAND CONSUMER
PROTECTION ACT MD. COM. LAW CODE § 13-101, *ET SEQ.* ................. 78

COUNT SIXTEEN VIOLATION OF THE MISSOURI MERCHANDISING
PRACTICES ACT MO. REV. STAT. § 407.010, *ET SEQ.* ................................ 79

COUNT SEVENTEEN VIOLATION OF THE MONTANA CONSUMER
PROTECTION ACT MONT. CODE ANN. § 30-14-101, *ET SEQ.* ................. 80

COUNT EIGHTEEN VIOLATION OF THE NEBRASKA CONSUMER
PROTECTION ACT NEB. REV. STAT. ANN. § 59-1601, *ET SEQ.* ............... 81

COUNT NINETEEN VIOLATION OF THE NEW HAMPSHIRE CONSUMER
PROTECTION ACT N.H. REV. STAT. ANN. § 358-A:1, *ET SEQ.* ................. 82

COUNT TWENTY VIOLATION OF THE NEW JERSEY CONSUMER FRAUD
ACT N.J.S.A.56:8-1, *ET SEQ.* ............................................................................ 83

COUNT TWENTY-ONE VIOLATION OF THE NORTH CAROLINA UNFAIR
AND DECEPTIVE TRADE PRACTICES ACT N.C. GEN. STAT. § 75-1.1,
*ET SEQ.* ................................................................................................................. 85

COUNT TWENTY-TWO VIOLATION OF THE NORTH DAKOTA
        CONSUMER FRAUD ACT N.D. CENT. CODE § 51-15-02 .......................................... 86

COUNT TWENTY-THREE VIOLATION OF THE OKLAHOMA CONSUMER
        PROTECTION ACT OKLA. STAT. TIT. 15, § 751, *ET SEQ.* .......................................... 87

COUNT TWENTY-FOUR VIOLATION OF THE PENNSYLVANIA UNFAIR
        TRADE PRACTICES AND CONSUMER PROTECTION LAW 73 P.S.
        § 201-1, *ET SEQ.* ...................................................................................................... 89

COUNT TWENTY-FIVE VIOLATION OF THE RHODE ISLAND DECEPTIVE
        TRADE PRACTICES ACT 6 R.I. GEN. LAWS ANN. § 6-13.1-1, *ET SEQ.* ..................... 90

COUNT TWENTY-SIX VIOLATION OF THE SOUTH CAROLINA UNFAIR
        TRADE PRACTICES ACT S.C. CODE ANN. § 39-5-10, *ET SEQ.* ................................. 91

COUNT TWENTY-SEVEN VIOLATION OF THE TENNESSEE CONSUMER
        PROTECTION ACT TENN. CODE ANN. § 47-18-101, *ET SEQ.* ................................... 93

COUNT TWENTY-EIGHT VIOLATION OF THE TEXAS DECEPTIVE TRADE
        PRACTICES CONSUMER PROTECTION ACT TEX. BUS. & COM.
        CODE § 17.41, *ET SEQ.* ............................................................................................ 94

COUNT TWENTY-NINE VIOLATION OF THE UTAH CONSUMER SALE
        PRACTICES ACT UTAH CODE § 13-11-1, *ET SEQ.* ................................................. 96

COUNT THIRTY VIOLATION OF THE VERMONT CONSUMER FRAUD
        ACT VT. STAT. ANN. TIT. 9, § 2451, *ET SEQ.* .............................................................. 97

COUNT THIRTY-ONE VIOLATION OF THE WASHINGTON CONSUMER
        PROTECTION ACT WASH. REV. CODE ANN. § 19.86.010, *ET SEQ.* ........................ 98

COUNT THIRTY-TWO VIOLATION OF THE WYOMING CONSUMER
        PROTECTION ACT WYO. STAT. ANN. § 40-12-101, *ET SEQ.* ................................... 99

DEMAND FOR JUDGMENT ................................................................................................ 100

JURY DEMAND .................................................................................................................... 101

The plaintiffs, on behalf of themselves and all others similarly situated, allege the following against AbbVie, Inc. (AbbVie or defendant), based on (a) their personal knowledge, (b) the investigation of counsel, and (c) information and belief.

## I.     INTRODUCTION

1.      The plaintiffs bring this proposed class action against AbbVie, the manufacturer of the largest selling prescription drug in the world, Humira, indicated for autoimmune, rheumatologic, and gastrointestinal disease, for the unfair and unconscionable practices that have led to the inflation of Humira's list (or point of sale) price in the United States. As one news story put it, the price of Humira has "defied gravity"[1] and is now more than $72,000 a year. As set forth below, AbbVie's practices also defy state laws. Prices are now so high that despite being prescribed, many Humira patients simply can't afford it.

2.      As an integral part of the scheme, AbbVie joined with the largest pharmacy benefit managers (PBMs)—CVS Health, Express Scripts, and OptumRx—to widen a secret spread between AbbVie's published list prices and the undisclosed net selling prices for Humira. AbbVie knows that PBMs profit when the size of the spread between list price and net selling price grows. AbbVie also knows that PBMs control a drug's formulary position relative to its competitors. So, AbbVie manufactures enormous spreads between Humira's list and net prices as a way to buy preferred tier positions on the PBMs' drug formularies.

3.      To carry out this scheme, AbbVie artificially inflates the prices it publicly reports—its list or "sticker" price (called by one court the "sucker price"). This soaring list-price then creates room for massive, undisclosed kickbacks—or "rebates"—to the PBMs in exchange for preferred

---

[1] Why Price of Humira Keeps Rising Despite FDA Approval of Generic Competition, *Washington Post* 1/8/2020.

formulary access. This practice pads the pockets of PBMs who retain a percentage of the rebates. And as the winning bidder (that is, the manufacturer with the highest spread), AbbVie receives preferred formulary placement.

4.      But as AbbVie and the PBMs continue to bank off an aging product, their perverse form of "competition" produces a victim: Americans who pay for Humira based on the list price AbbVie sets. Rather than pay for Humira based on competitive net prices offered to some intermediaries in the pharmaceutical supply chain, consumers pay for their drug at the point of sale based on AbbVie's *list* prices—prices that it inflates so that it can pay off the PBMs without lowering its net prices. This practice yields absurd results. As Humira ages, and emerging alternative therapies threaten its spot on PBM formularies, AbbVie has responded by aggressively raising its list price to facilitate greater kickbacks to the PBMs and protect Humira's market share. In other words, as the drug's value has *decreased*, its cost to consumers has skyrocketed.

5.      As a result, AbbVie publicly holds out list prices that are effectively meaningless, insofar as they lack any reasonable relationship to production costs, the recoupment of research and development costs, or the cost of other consumer goods. And behind closed doors, AbbVie bids on formulary access by offering kickbacks to PBMs, yielding a second "secret" price driven down by this perverse form of competition. This unfair and unconscionable practice imposes out-of-pocket costs on consumers that they cannot avoid unless they don't take Humira as prescribed.

6.      AbbVie's unfair and unconscionable conduct resulted in damages to the plaintiffs and class members for out-of-pocket payments for Humira and/or for other actual damages if they could not afford Humira, including physical suffering and out-of-pocket payments for drugs that are inferior to physician-prescribed Humira.

7.      As shown in the following chart, Humira's list price <u>doubled</u> in a five-year period alone (from January 2015 to January 2020), from approximately $1,700 per month to $3,400 per month without any corresponding material increase in the actual costs of the production. Members of the proposed class pay for Humira based on the green/top line in the chart below:



8.      As shown below, the price increases for Humira far exceed price increases for other categories of typical expenses (Humira list prices are the blue/top line):



9.      With respect to Humira, the U.S. House Committee on Oversight and Reform found that the pricing practices uncovered by the Committee's investigation are "unsustainable, unjustified, and unfair to patients and taxpayers."

10.     The House Staff Report made "Key Findings" with respect to Humira that are so salient they are quoted below:

> Humira, a drug used to treat rheumatoid arthritis and other autoimmune diseases, is the highest grossing drug in the world. In 2020 alone, AbbVie collected $16 billion in U.S. net revenue for Humira. Today, AbbVie charges approximately $77,000 for a year's supply of Humira—470% more than when the drug was launched in 2003.

> AbbVie and its partner Janssen Biotech, Inc., a Johnson & Johnson subsidiary, are the sole U.S. manufacturers of Imbruvica, a drug approved to treat mantle cell lymphoma and certain other forms of cancer. Under the companies' collaboration agreement, AbbVie is responsible for marketing Imbruvica in the United States, including pricing decisions. Today, AbbVie and Janssen charge over $181,529 for a year's supply of Imbruvica-82% more than when the drug was launched in 2013. Experts estimate that by 2026, Imbruvica will be the fourth highest grossing drug in the United States, in part because of price increases.

The findings in this report are based on the Committee's review of more than 170,000 pages of internal documents, communications, and data related to Humira and Imbruvica from 2009 to the present. The Committee requested these materials more than two years ago, but AbbVie obstructed the Committee's investigation. In September 2020, Chairwoman Carolyn B. Maloney notified Committee Members of her intent to issue a subpoena to AbbVie due to the company's refusal to cooperate with the Committee's investigation. After this notice, AbbVie finally began to produce long overdue materials in response to the Committee's requests.

The Committee's investigation uncovered the following key findings:

- **Uninhibited Price Increases:** Since launching Humira in 2003, AbbVie (and its predecessor company Abbott Laboratories) have raised the drug's price 27 times, including by nearly 30% in one 10-month period. A 40-milligram syringe of Humira is now priced at $2,984, or $77,586 annually—a 470% increase from the drug's launch. AbbVie has also raised the price of Imbruvica by 82% since launching the drug in 2013. Today, Imbruvica is priced at $181,529 per year for a patient taking three pills per day, compared to $99,776 per year at launch.

- **Price Increases Not Justified by Rebates:** Internal data show that AbbVie's list price increases for Humira and Imbruvica far outpaced any discounts and rebates paid to pharmacy benefit managers and other members of the supply chain. Humira's net price—which subtracts discounts and rebates—increased by 110% between 2009 and 2018, from $16,663 per year to $35,041 per year. For a patient taking 3 tablets daily, the annual net price of Imbruvica increased from $72,587 in 2013 to $115,533 in 2017 (the last year for which AbbVie provided the Committee data).

- **Record Corporate Revenue Driven by Price Increases:** Since 2003, AbbVie has collected over $107 billion in U.S. net revenue from Humira. AbbVie's yearly U.S. net revenue from Humira more than tripled from $5.3 billion in 2013—the year it separated from Abbott—to $16.1 billion in 2020. Due in large part to AbbVie's price increases, Humira is the highest grossing drug in the United States. U.S. net revenue for Imbruvica has increased from $492 million in 2014 to $4.3 billion in 2020. AbbVie's U.S. net revenue for both drugs has increased every year since the drugs entered the market, as shown in the two graphs below.





- **Hundreds of Millions in Executive Compensation and Bonuses:** Since separating from Abbott in 2013, AbbVie has paid its highest-ranking executives over $480 million in compensation. AbbVie's CEO Richard Gonzalez alone was paid nearly $170 million over that period. AbbVie's internal documents show that from 2015 to 2018, senior executive bonuses were tied directly to Humira net revenue, allowing them to profit from AbbVie's price increases. The first year this net revenue incentive was added to the calculation coincided with the highest period of price increases in Humira's history—over 30% in a 10-month period.

- **Targeting the U.S. for Higher Prices:** Humira and Imbruvica are much more expensive in the United States than in other countries that negotiate directly with drug companies to lower prices. In 2015, a single syringe of Humira cost $1,000 more in the United States than in countries such as Canada, Japan, Korea, and

the United Kingdom. Over time, AbbVie raised the price of Humira in the United States while being forced to reduce the price internationally.



Similarly, in 2018, AbbVie charged nearly double for Imbruvica in the United States as compared to Australia and countries in Europe, such as the United Kingdom and France. AbbVie's internal records include hundreds of pages of complaints from U.S. patients and caretakers who described the tremendous burden Humira's constantly increasing price placed on them and their loved ones. One retiree with Crohn's disease who could not afford the drug called AbbVie's pricing "unconscionable." The daughter of another patient who relied on Humira wrote to AbbVie that its efforts to block more affordable alternatives from coming to market were "cold, and heartless."

- **Shadow Pricing with Amgen:** AbbVie's largest competitor for Humira is Enbrel, Amgen's blockbuster biologic treatment for rheumatoid arthritis and other conditions. Instead of pricing Humira and Enbrel below one another to gain market share—as expected in a competitive market—AbbVie and Amgen engaged in a practice known as "shadow pricing," consistently following the other company's price increases. As a result, both companies repeatedly raised the price of Humira and Enbrel by nearly identical amounts. The graph below shows AbbVie's and Amgen's pricing for Humira and Enbrel from 2003 to 2021.



- **Profit-Driven Research Expenditures:** In response to the Committee's request, AbbVie identified a total of $5.19 billion in "Humira Research & Development" expenditures between 2009 and 2018—approximately 4.2% of the company's Humira worldwide net revenue over that period.

11.     On top of straining the United States health care system, the House Committee found that drug companies' pricing practices, including those of AbbVie, have left millions of Americans unable to afford lifesaving medications. According to data from the Kaiser Family Foundation from October 2021, approximately one-quarter of Americans reported struggling to afford their medications, and three in ten American adults reported not taking their medicines as prescribed at some point in the year before due to cost.[2] Americans rely on the drugs produced by pharmaceutical companies, but the Committee's investigation shows that the industry's excessive prices and anticompetitive practices are not justified by the need for innovation and have been used to enrich company executives and shareholders; the pricing of Humira is a poster child for this problem.

12.     Those injured by AbbVie's pricing practices include consumers who pay for their drugs based on list prices, a price the House Staff found to be "unfair." The plaintiffs and class

---

[2] Kaiser Family Foundation, *Public Opinion on Prescription Drugs and Their Prices* (Oct. 18, 2021) (online at www.kff.org/slideshow/public-opinion-on-prescription-drugs-and-their-prices/).

members are people living with serious diseases who pay for their Humira based on list prices, including uninsured patients, patients in high deductible health plans, patients in Medicare Part D plans, and patients with coinsurance obligations. Their out-of-pocket expenditures at the point of sale are based on the list price manipulated as part of the unfair rebate scheme. In other words, when the plaintiffs and class members go to pharmacies (or use mail order services) to pick up their Humira, the charges they incur are based on Humira's *list* price, not the *net* price.[3] The kickbacks AbbVie offers PBMs *are not reflected in price tags the plaintiffs and class members see*. And the larger the list price, the larger the consumer's out-of-pocket payments. AbbVie, at all times, knew of the impact its list price increases had on consumers and knew that such list price increases adversely impacted cash payers, those with high deductible health plans and those with a percentage co-pay.

13.     AbbVie closely tracked and was aware of the differences between the list price (WAC plus) and its actual sales price (ASP) and the effect of this price difference on consumers as depicted in the internal AbbVie document:

---

[3] If the consumer is uninsured, the pharmacy offers the consumer a "usual and customary rate" based on list price.



14.     AbbVie's unfair and unconscionable pricing practices have caused the plaintiffs and class members to make inflated out-of-pocket payments for their Humira or, if they cannot afford out-of-pocket payments for Humira, has caused them to suffer other actual damages, including physical suffering and out-of-pocket payments for drugs that are inferior to their physician-prescribed Humira. AbbVie publicly represents that the list prices of Humira are just that, *list* prices—a fair representation of the product's value in the market and a reasonable basis for consumer out-of-pocket payments. Thus, by holding out to the public its meaningless list prices while keeping its competitive net prices confidential, AbbVie has harmed the plaintiffs and class members, causing them to make out-of-pocket payments for their Humira that are grossly inflated or, if they cannot afford out-of-pocket payments for Humira, causing them to suffer other actual

damages, including physical suffering and out-of-pocket payments for drugs that are inferior to their physician-prescribed Humira.

15.     Nor is this the first time a drug manufacturer has had to defend unlawful pricing. In a case from nearly 20 years ago, defendant drug manufacturers "repeatedly asserted that they had no duty to disclose what was publicly known to everyone, that is, that the [drug's list price] was a 'sticker price' and never intended to reflect the drug's true average wholesale price."[4] But the district court saw through this argument: "There is a difference between a sticker price and a sucker price[.] The [plaintiffs] ... have it exactly right: '[I]f everything [about the drug] was known to everybody, why did [d]efendants emphasize secrecy?'"[5] As the court explained, the "defendants trumpeted a lie by publishing the inflated [list prices], knowing (*and intending*) them to be used as instruments of fraud."[6]

16.     Had AbbVie published list prices uninflated by the unfair and/or unconscionable rebate and pricing scheme, Humira would have cost the plaintiffs and class members much less and/or they would be able to take Humira as prescribed by their doctor.

17.     This action alleges that AbbVie violated various state consumer protection laws by publishing arbitrary, inflated list prices for Humira while secretly paying rebates to certain PBMs to buy formulary access. This scheme directly and foreseeably caused and continues to cause consumers to overpay for the Humira they need or, if they cannot afford out-of-pocket payments for Humira, has caused them to suffer other actual damages, including physical suffering and out-of-pocket payments for drugs that are inferior to their physician-prescribed Humira.

---

[4] *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 168 n.19 (D. Mass. 2003).
[5] *Id.*
[6] *Id.* at 167 (emphasis added).

## II.      PARTIES

**A.      Plaintiffs**

### 1.      Edward Camargo

18.      Plaintiff, Edward Camargo, is a resident of Indiana. From the age of 19 to the age of 26 (approximately 2013-2018), he took prescription Humira to treat his psoriatic arthritis and psoriasis as directed by his doctor. At the time, he was on his father's insurance but paid for the drug himself. When he turned 26, he could no longer be on his father's insurance, and his new insurance refused to pay for Humira due to its cost.

19.      As a result, he had to quit taking Humira, because he could not afford to pay for it based on its price for uninsured patients or its cash price. Humira alleviated plaintiff's pain associated with psoriatic arthritis and plaque psoriasis and also erased the scaliness that came with plaque psoriasis. He suffered the worst pain he had ever felt when he stopped taking Humira. The pain was far worse than any pain he had experienced before he started taking Humira. Before Humira he had some pain and scaling on his scalp only. After he stopped taking Humira, he had scaling on his scalp, knees, abdomen, back of arms, forehead, and private area. The scales were itchy and extremely dry. When he itched the scales, they would get itchier and start bleeding. It was also painful to touch them because the skin was fragile. His skin would crack and bleed, and no amount of moisture would help.

20.      Approximately a year after he had to stop taking Humira, he was able to obtain prescription Otezla through his insurance. But Otezla did not work at all.

21.      Mr. Camargo is now taking prescription Tremfya, for which he pays $5 per month. Tremfya helps alleviate his symptoms somewhat but not nearly as well as Humira. He still has some

pain and some plaque on his scalp and behind his ears. His skin has some dryness. He still has pain in his fingers.

22.     If Mr. Camargo could afford Humira, he would take it rather than Tremfya, because Humira is far more effective for him.

**2.     Judith Mandel**

23.     Plaintiff, Judith Mandel, is a resident of Connecticut. In 2011, she began taking Humira, following a doctor's prescription. For eight years, she purchased Humira under her private insurance plan paying copayments. But that would change after her 65th birthday when she qualified for Medicare.

24.     In 2019, Ms. Mandel switched to a Medicare Advantage health plan with prescription drug coverage. To fill her prescription under this plan, Ms. Mandel had to pay a varying percentage of Humira's list price (depending on the stage of coverage). And because of Humira's inflated list price, Ms. Mandel needed to pay approximately $2,500 to fill just her first two Humira prescriptions of the year. Even during the catastrophic phase of coverage, in which she owed 5% of Humira's list price, she still needed to pay hundreds out-of-pocket every month to acquire the drug.

25.     Ultimately, Ms. Mandel developed an allergic reaction to the medication that forced her to discontinue Humira in December 2020. But in just over a year on Medicare, she still spent almost $9,000 out-of-pocket for Humira.

**3.     Simone Nazareth**

26.     Simone Nazareth is a resident of California. At age 19, she was diagnosed with rheumatoid arthritis. In 2015, when she was 21, she received a prescription for Humira to treat her symptoms.

27.     Even with insurance, Ms. Nazareth still owed a percentage of Humira's list price, meaning her prescriptions proved incredibly expensive and were inflated by the scheme. The drug accounted for thousands in out-of-pocket costs every year for many years; in fact, her Humira purchases would almost single-handedly meet the family's deductible while on her family's insurance. Ms. Nazareth has since transitioned to Amjevita, a biosimilar.

### 4.     Bonnie Goltz

28.     Plaintiff Bonnie Goltz lives in Michigan. In April 2017, her physician prescribed Humira to treat the chronic joint pain caused by her rheumatoid arthritis. Initially, she could afford Humira, paying $15 a month while on AbbVie's patient assistance program. But that changed when she retired in September 2022.

29.     Upon her retirement, Ms. Goltz became a Medicare beneficiary, which resulted in AbbVie denying her access to the patient assistance program. Without access, Ms. Goltz must pay a portion of Humira's list price to buy the drug; she was told the cost would be approximately $3,800 per month.

30.     Ms. Goltz cannot afford this, so absent the occasional Humira sample provided by her doctor, her rheumatoid arthritis goes untreated. Her symptoms have reemerged. And her mental and physical well-being have deteriorated. Once very active, she now has trouble walking and climbing stairs. But for the price inflation scheme she would still be on Humira.

### B.     Defendant

### 1.     AbbVie, Inc.

31.     AbbVie's corporate offices are at 1 North Waukegan Road, North Chicago, Illinois 60064.

**2.      AbbVie manufactures Humira.**

32.      Humira (adalimumab) is a biologic therapy administered as a subcutaneous injection. It is approved to treat the following autoimmune diseases in the United States, Canada, and Mexico (collectively, North America) and in the European Union:

- Rheumatoid arthritis (moderate to severe)

- Psoriatic arthritis

- Ankylosing spondylitis

- Adult Crohn's disease (moderate to severe)

- Plaque psoriasis (moderate to severe chronic)

- Juvenile idiopathic arthritis (moderate to severe polyarticular)

- Ulcerative colitis (moderate to severe)

- Pediatric Crohn's disease (moderate to severe)

- Hidradenitis suppurativa (moderate to severe)

- Non-infectious intermediate, posterior and panuveitis

### III.      JURISDICTION AND VENUE

33.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), which provides original jurisdiction over civil actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant.

34.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965, because AbbVie transacts business in, is found in, and/or has agents in the Northern District of Illinois, which is AbbVie's principal place of business, and because some of the actions giving rise to this complaint took place within this district.

35.     The Court has general personal jurisdiction over AbbVie, which has admitted in numerous SEC filings that its principal place of business is 1 N Waukegan Road, North Chicago, Illinois 60064.[7] Moreover, this Court has specific jurisdiction because AbbVie has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme in this District.

## IV.     DRUG PRICING IN THE UNITED STATES

### A.     Entities Involved in Drug Pricing

36.     The prescription drug industry consists of an opaque network of entities, including pharmaceutical companies, wholesalers, pharmacies, health benefit providers (institutional insurers, self-insured employers, health and welfare plans), pharmacy benefit managers, and patient-consumers.

37.     ***Pharmaceutical Companies***. Pharmaceutical companies (also known as drug companies or drug manufacturers) own the rights to manufacture and market drugs. This remains true even if these companies contract out the actual production of their drugs. Pharmaceutical companies typically own or contract with facilities that manufacture drugs and then sell their products to wholesalers. Critically, pharmaceutical companies set the prices of their drugs and then those prices are used to calculate payments consumers make. AbbVie here is a pharmaceutical company.

---

[7] *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) ("With respect to a corporation, the place of incorporation and principal place of business are 'paradig[m] ... bases for general jurisdiction.'") (citation omitted).

38. *Wholesalers*. After production, AbbVie sends its drug to FDA-registered drug wholesalers for further distribution. Wholesalers purchase inventory and sell pharmaceutical products to a variety of providers, including retail pharmacy outlets, hospitals, and clinics.

39. *Health benefit providers*. Health benefit providers include institutional insurers, self-insured employers, and health and welfare plans. These plans submit payments on behalf of insured individuals to healthcare providers for services rendered to those individuals. Health insurers also cover a portion of their beneficiaries' drugs costs, submitting payments to pharmacies on behalf of their members. The term "health insurers" includes public and private entities, the latter of which includes self-insured businesses, insurance companies, union-run health plans, and private plans that sponsor Medicaid and Medicare drug benefits.

40. *Pharmacy Benefit Managers*. Pharmacy benefit managers (PBMs) effectuate financial and contractual arrangements between drug manufacturers, pharmacies, and health insurers. In this role, PBMs perform various services on behalf of their health insurer clients, including the negotiation of rebates with drug companies, creation of formularies, management of prescription billing, construction of retail pharmacy networks for insurers, and provision of mail-order services. Still, they generally are not a direct link in the physical supply chain for pharmaceutical products because, in most instances, they do not take possession or control of prescription drugs. The largest PBMs are CVS Health, Express Scripts, and OptumRx. Together, they cover roughly 80 to 85 percent of privately insured Americans.

B. **The Drug Payment & Distribution Structure**

41. *Distribution*. Generally speaking, for retail pharmacy channels, branded prescription drugs are distributed from manufacturer to wholesaler, wholesaler to retail pharmacy (or mail order), and retailer to patient.

42. ***Downstream charges***. The downstream charges are from manufacturer to wholesaler, wholesaler to retailer (or mail order), and retailer (or mail order) to the health benefit providers (in the form of ingredient cost reimbursement and dispensing fees) and consumers (in the form of coinsurance, copayment, deductible payment, and/or cash).

43. ***Upstream charges***. The upstream charges are from health benefit providers and/or PBMs directly back to the manufacturer. These upstream charges are price discounts AbbVie offers PBMs and their health insurer clients in the form of "rebates." They typically occur well after the point-of-sale transactions.

44. The figure below illustrates this payment structure. This figure labels certain payments "payment" and others "negotiated payment." The term "payment" refers to individual payments, made at the time of delivery; for example, when a patient walks into a pharmacy and picks up her prescription. At that moment, her health plan also pays a service fee to its PBM for dispensing the drug through its network of retail pharmacies. In contrast, a "negotiated payment" is a payment made under a negotiated contract. For example, a PBM might negotiate a contract with a drug manufacturer for supply of X drug for $Y per pill for a period of time. The figure also shows the flow of products and rebates.

Figure 1: The U.S. Drug Payment Structure[8]



45.     When an insured consumer buys a medication from a pharmacy (a retailer), her insurer pays the pharmacy based on the price its PBM negotiated for that medication (the net price). In addition to her insurer's payment, the patient usually pays for a portion of the medication's cost, out-of-pocket. Importantly, the patient's payment is typically based on the list price the *drug manufacturer* set for that drug.

## C.     List pricing as a Basis for Reimbursement

46.     The prices for the drugs distributed in this chain are different for each participating entity: different actors pay different prices for the same drugs. In this system, only a drug's list

---

[8] Allison Tsai, *The Rising Cost of Insulin*, Diabetes Forecast (Mar. 2016), http://www.diabetes forecast.org/2016/mar-apr/rising-costs-insulin.html.

price—known as its Average Wholesale Price (AWP) or the mathematically-related Wholesale Acquisition Price (WAC)—is publicly available.

47.     The prescription drug industry is unusual in that there are stark differences in the way patients pay for the products versus the ways institutions and health benefit providers pay for the same products. The beneficiary of this industry's products (the patient) typically pays in one of several predictable ways for a *single* product based on the manufacturer's published list price. First, in the case of coinsurance, consumers pay a pre-set percentage of the point-of-sale transaction price, based on list price. Second, in the case of cash transactions, consumers pay a usual and customary price, based on list price. The greater the list price, the more cash a consumer pays. And, third, in the case of deductibles, consumers pay a portion of the point-of-sale transaction price, based on list price. (Consumers might also pay a tiered or fixed copay.) Consumers make these payments at the *point-of-sale* only. In contrast, intermediaries and third-party payers typically determine net costs for pharmaceuticals based on arrangements that apply to *hundreds of products*. And these charges occur not only at the point-of-sale, but also during later, off-invoice transactions.

48.     The use of price lists to calculate and communicate reimbursement payments reflects an efficient method by which to maintain the system's flexibility, minimize uncertainty through predictable costs, maximize coverage in a cost-effective manner, and provide a mechanism for competition among payers. Payers' reimbursement formulas will often include a series of price benchmarks and payment caps. The price benchmarks used in payers' formulas are commonly adjusted by a percentage that is contractually set (for commercial payers) or established through regulatory procedures (for public payers). For example, reimbursement could be determined based on the lower of the drug's (i) AWP – $x$%, (ii) WAC + $y$%, and (iii) payment cap.

49.     Despite multiple modifications to health insurers' reimbursement policies over time, the most commonly and continuously used set of reference prices in reimbursement and provider payment calculations and negotiations for retail channel drug transactions remains WAC. Crucially, WAC is the basis for consumers' payments for Humira. Defendant has complete control over the setting of the WAC for its products.

50.     From an administrative perspective, WAC provides a logical starting point for the calculation and communication of reimbursement to various pharmacy providers for various drugs. Moreover, given the historical use of WAC (and its mathematically related counterpart, AWP) by all industry participants, one cannot discount the significance of WAC's entrenchment in the complex and highly automated payment system used to process billions of payments. As such, it is widely used as a competitive list and to estimate costs and revenues.

51.     This list price serves as the immovable reference point off which PBMs and drug manufacturers negotiate rebates. As previously explained, PBMs create formularies for their health insurer clients, and those formularies significantly influence patients' drug purchasing behavior. Health insurers cover all or a portion of their members' drug costs based on whether and where the drugs fall on their PBMs' formularies. Drug companies offer PBMs rebates—discounts off list prices—to influence the PBMs' formulary decisions.

52.     As explained in the following section, consumer payments are directly based on the manufacturers' list prices.

**D.     Consumer Drug Costs**

53.     Pharmaceutical companies directly set the prices certain consumers pay by setting list prices.

54. When a consumer goes to a retail pharmacy (or the website of a mail order pharmacy) and requests to buy a drug, the pharmacy's computer system pulls up AWP, which is the list price the *manufacturer* of that drug set and published, plus an approximately 15-20% markup. The basis for that price is *not* determined by the pharmacy or the wholesaler that brought the drug to the pharmacy. Rather, the pharmacy's computer system taps into a database of prices that manufacturers created and published through third-party publishers. The pharmacy's search for the drug's price is akin to a stockbroker's search for the price of a stock; the pharmacy, like the broker, does not and cannot change or influence the list price. It can only report that price to the consumer. In short, the prices pharmacies charge consumers are directly computed using the manufacturer's list prices.[9]

55. Three principal types of consumers pay based on the list prices that drug manufacturers—and drug manufacturers alone—set: (1) uninsured consumers; (2) consumers in high deductible plans; and (3) consumers with coinsurance obligations.

56. ***Uninsured***. Uninsured consumers must pay full, point-of-sale prices (based on list prices) every time they pick up their prescriptions. Despite the Affordable Care Act's expansion of Medicaid coverage and establishment of Health Insurance Marketplaces, millions of people—28.5 million in 2015—remain without coverage. This uninsured population is especially concentrated in states that did not take the Medicaid expansion. Of the 28.5 million uninsured, reports indicate that 46% tried to get coverage but could not afford it.

57. The uninsured are not the only patients saddled with high out-of-pocket costs. Despite their monthly insurance premiums, insured consumers often pay a significant portion of a

---

[9] This complaint refers to this price as the full, point-of-sale price (based on list price).

drug's list price. Out-of-pocket costs for insured consumers come in three forms: deductibles, coinsurance requirements, and/or copayment requirements.

58.     ***High deductible Plans***. The term "deductible" refers to a set amount of healthcare cost an insured must shoulder (out-of-pocket) before her plan will begin to contribute to her healthcare costs. Although most health plans have some form of a deductible, high deductible health plans are aptly named for their larger-than-average deductibles. And while high deductible health plans usually boast lower premiums, they are more onerous to patients and families that need expensive care on a regularly. Insured individuals in high deductible plans are usually required to pay full, point-of-sale prices (based on list prices) before they reach their deductibles.

59.     The past decade has witnessed a shift away from traditional health plans, which provide broader coverage, toward high deductible health plans. In their 2016 survey of employer health benefits, the Kaiser Family Foundation found that 29% of all covered employees are now enrolled in high deductible health plans, up from 17% in 2011. Although Preferred Provider Organizations (PPOs) are still the most common plan type (48% of Americans are enrolled in PPOs), enrollment in PPOs has fallen 10% over the last two years, while enrollment in high deductible health plans has increased by 8%. Figure 2 illustrates the rising trend in high deductible plans.

**Figure 2: Percentage of covered workers enrolled in high deductible health plans from 2006 to 2016.[10]**



*Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: Covered Workers enrolled in an HDHP/SO are enrolled in either an HDHP/HRA or a HSA-Qualified HDHP. For more information, see the Survey Methods Section. The percentages of covered workers enrolled in an HDHP/SO may not equal the sum of HDHP/HRA and HSA-Qualified HDHP enrollment estimates due to rounding.

SOURCE:  Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2016.



60.     Moreover, deductibles themselves have risen. The average annual deductible for an individual enrolled in a high deductible plan was between $2,031 and $2,295 in 2016, depending on the exact type of plan.[11] The average annual deductible for family coverage was between $4,321 and $4,364 in 2016, again, depending on the type of plan.

61.     A recent Kaiser Family Foundation study found that 30% to 40% of U.S. households with private coverage do not have enough liquid assets to pay the deductible required by their health plan. Figure 3 below demonstrates this reality.



[10] *2016 Employer Health Benefits Survey*, Kaiser Family Foundation 3 (2016), https://kaiser familyfoundation.files.wordpress.com/2016/09/employer-health-benefits-2016-summary-of-findings.pdf.

[11] There are two primary types of high deductible health plans: high deductible plans with Health Reimbursement Arrangements and high deductible plans with Health Savings Accounts.



**Figure 3: Share of non-elderly households with liquid assets less than their deductibles among people with private health insurance.[12]**

62. Overall, in the entire employer-based health plan marketplace, deductibles have risen 12% since 2015—four times faster than premiums increased in the same period. Among all individuals enrolled in employer health plans (both high deductible plans and others), the average deductible in 2016 was $1,478.

63. The average deductible for individuals working at smaller firms was higher than that in larger firms ($2,069 v. $1,238 in 2016).

64. Figure 4 shows the increase in health plans with a general annual deductible of $1,000 or more, broken down by firm size.

---

[12] Drew Altman, *The Biggest Health Issue We Aren't Debating*, Axios (Nov. 22, 2017), https://www.axios.com/the-biggest-health-issue-we-arent-debating-2511098849.html (graphic based on data from Matthew Rae, Gary Claxton, and Larry Levitt, *Do Health Plan Enrollees Have Enough Money to Pay Cost Sharing*, Kaiser Family Foundation (Nov. 23, 2017), https://www.kff.org/health-costs/issue-brief/do-health-plan-enrollees-have-enough-money-to-pay-cost-sharing/).

**Figure 4: Percentage of covered workers enrolled in a plan with a general annual deductible of $1000 or more for single coverage, by firm size, from 2006 to 2016.**[13]




\* Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: These estimates include workers enrolled in HDHP/SO and other plan types. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2016.

65.     The average deductibles for plans available under the Affordable Care Act on the Marketplace Exchanges are also high. The Marketplace health plans are broken into "metal" tiers: bronze, silver, gold, and platinum. The cheapest plans—bronze and silver—unsurprisingly come with very high deductibles. In 2016, the average deductibles in such plans were $5,765 for bronze plans (up from $5,328 in 2015) and $3,064 for silver plans (up from $2,556 in 2015).

66.     High deductible plans are tough on patients with chronic diseases: not only do patients living with chronic diseases hit their deductibles year after year, but they hit their deductibles over a shorter period of time, resulting in significant financial burden at the start of

---

[13] *2016 Employer Health Benefits Survey*, Kaiser Family Foundation 4 (2016), https://kaiser familyfoundation.files.wordpress.com/2016/09/employer-health-benefits-2016-summary-of-findings.pdf.

each year. Individuals and families who do not have savings or access to credit often take less medication than prescribed to spread their out-of-pocket payments over a longer period.

67.     ***Coinsurance and Copayments***. On top of their deductibles, individuals with insurance typically make copayments or coinsurance payments for the healthcare services they need. A copayment is a fixed or tiered fee that an individual must pay for a healthcare service at the time of care; for example, when she picks up a prescription. Copayment rates vary depending on the drug; drugs in preferred formulary positions usually have lower copays, and drugs in disfavored formulary positions require larger copays.

68.     Coinsurance is similar. However, instead of paying a fixed or tiered fee for a particular service, individuals with coinsurance arrangements are required to pay a fixed *percentage* of the cost of the healthcare service provided. For drugs, this means a percentage of the plan's point-of-sale price, which is mathematically tied to the drug's *list* price. This percentage can vary, with lower coinsurance rates for preferred drugs and higher coinsurance rates for disfavored drugs.

69.     For those in high deductible health plans, copayments and coinsurance obligations begin after they reach their deductibles. Plans that cover prescription drugs right away, not requiring patients to reach deductibles first, usually require copayments or coinsurance contributions for every drug purchase.

70.     For covered workers enrolled in health plans with three or more tiers of cost sharing for prescription drugs, the average coinsurance rates in 2016 were 17% for first-tier drugs, 25% for second-tier drugs, 37% for third-tier drugs, and 29% for fourth-tier drugs (fourth tier drugs are usually specialty medications, for diseases such as cancer, and are extremely expensive). Humira is still a branded drug. Therefore, insurance plans generally classify it as a second-tier or

third-tier drug on their formularies. As a result, coinsurance payments keyed to the list price of Humira can be quite burdensome.

71.     Recently, health plans have been demanding higher and higher coinsurance contributions from patients. Table 1 shows this trend.

### Table 1: Rising Coinsurance Rates

| Retail Coinsurance Payment | | | |
|---|---|---|---|
| | T2 Brand | T3 Brand | Flat |
| 1998 | 24.7% | 26.0% | 20.7% |
| 1999 | 24.9% | 26.9% | 21.0% |
| 2000 | 26.0% | 28.0% | 22.0% |
| 2001 | 24.0% | 29.0% | 20.0% |
| 2002 | 24.4% | 34.7% | 23.0% |
| 2003 | 24.3% | 32.4% | 22.0% |
| 2004 | 25.0% | 32.0% | 25.0% |
| 2005 | 26.5% | 35.6% | 23.0% |
| 2006 | 26.2% | 36.0% | 23.0% |
| 2007 | 26.4% | 37.9% | 22.0% |
| 2008 | 26.1% | 37.0% | 24.0% |
| 2009 | 26.3% | 35.8% | 22.0% |
| 2010 | 25.2% | 36.6% | 24.0% |
| 2011 | 25.6% | 37.9% | 23.0% |
| 2012 | 26.1% | 37.6% | 22.0% |
| 2013 | 25.5% | 37.1% | 22.0% |
| 2014 | 24.3% | 35.9% | 22.0% |
| 2015 | 27.1% | 41.8% | 22.0% |

72.     Over the past decade, out-of-pocket spending for prescription drugs has shifted away from copayments toward deductibles and coinsurance spending. In 2014, patients paid for 24% of their out-of-pocket prescription drug expenses through deductibles, compared to just 4% in 2004. Similarly, patients paid for 20% of their out-of-pocket drug expenses through coinsurance in 2014, compared to just 3% in 2004.

73.     ***Medicare Part D***. Finally, patients in Medicare Part D plans—Medicare's prescription drug program—often pay a large portion of their drugs' list prices. In 2017, the Medicare Part D standard prescription drug plan had a $400 deductible and a 25% coinsurance

obligation up to an initial coverage limit of $3,700. This meant patients in Medicare Part D plans

paid full, point-of-sale prices (based on list price) until they spent $400. After they hit this

deductible, they paid 25% of their drugs' point-of-sale prices (based on list prices) until they,

together with their plans, spent $3,700 on drugs. Once Part D patients met this $3,700 coverage

limit, they fell into the Coverage Gap, more commonly known as the "Donut Hole." In the Donut

Hole, they were required to pay 40% of their brand-name drugs' point-of-sale prices. Only once the

patients' total out-of-pocket spending (both before and in the Donut Hole) reached $4,950 did

their Medicare Part D plans begin to shoulder 95% of their healthcare costs again. Figure 5

demonstrates patient cost-sharing in the standard Medicare Part D plan for 2017.

**Figure 5: The standard Medicare prescription drug benefit in 2017.[14]**



[14] *The Medicare Part D Prescription Drug Benefit*, The Kaiser Family Foundation 6 (Sept. 26, 2016), http://kff.org/medicare/fact-sheet/the-medicare-prescription-drug-benefit-fact-sheet/.

E.     **AbbVie Aggressively Raised Prices to Meet Revenue Targets**

74.     The House Committee found that drug companies have repeatedly raised prices on existing drugs, while setting higher launch prices for new drugs.[15]

### Figure 6: Price Increases and Revenue

| Drug | Price Today | No. of Price Increases* | Price Increase Since Launch | 2019 U.S. Net Revenue |
|------|-------------|-------------------------|-----------------------------|------------------------|
| Copaxone (Teva) | $85,400/year | 25+ | 825% | $950 Million |
| Enbrel (Amgen) | $72,200/year | 25+ | 486% | $5.05 Billion |
| Gleevec (Novartis) | $123,000/year | 20+ | 395% | $330 Million |
| H.P. Acthar (Mallinckrodt) | $39,864/vial | 5 | > 100,000% | $953 Million |
| Humalog (Eli Lilly) | $274.70/vial | 30+ | 1219% | $1.67 Billion |
| Humira (AbbVie) | $71,600/year | 25+ | 471% | $14.9 Billion |
| Imbruvica (AbbVie) | $181,500–$242,000/year | 5+ | 82% | $3.83 Billion |
| Lantus (Sanofi) | $283.56/vial | 20+ | 715% | $1.14 Billion |
| Lyrica (Pfizer) | $1,200/year | 20+ | 420% | $2.01 Billion |
| NovoLog (Novo Nordisk) | $289.36/vial | 25+ | 627% | $1.18 Billion |
| Revlimid (Celgene/BMS) | $192,000/year | 20+ | 255% | $6.27 Billion |
| Sensipar (Amgen) | $9,800/year | 20+ | 232% | $252 Million |

*\* Number of price increases since launch or acquisition*

75.     The House Committee also found Internal data obtained by the Committee reveals that the net prices—the prices manufacturers collect after accounting for rebates, price concessions, and other discounts of nearly all of the drugs in the investigation increased year over year.[16] Net prices for all of the drugs examined are significantly higher today than at launch. This data, which has never been shared with the public, undermines industry claims that price increases are due largely to increasing rebates and discounts paid to pharmacy benefit managers (PBMs).

---

[15] Drug Pricing Investigation, Majority Staff Report, Committee on Oversight and Reform, U.S. House of Representatives, December 2021, at v.

[16] In the insulin market, net prices increased steadily from when the drugs entered the market (1996 for Humalog and 2000 for NovoLog and Lantus) until the mid-2010s. Since the mid-2010s, competition over formulary placement has led to increasing pharmacy benefit manager rebates and stabilized net price growth.

76.     These price increases have fueled large corporate revenues. The ten companies in the Committee's investigation generated a combined $38.5 billion in U.S. net revenues from the sales of just 12 drugs in 2019 alone.[17]

**F.      Executive Compensation Provides Incentives to Raise Prices**

77.     The ten companies in the Committee's investigation paid their top executives more than $2.2 billion from 2016 to 2020, including $797 million in chief executive officer (CEO) compensation. All ten companies have compensation structures that tie incentive payments to revenue and other financial targets, and several companies directly tied incentive compensation to drug-specific revenue targets. The investigation showed that for at least two companies, the company would have missed its revenue targets and the executives would not have received bonuses had they not raised drug prices. AbbVie's executives topped the compensation list, raking in over $340 million over a five-year period while class members can't afford their Humira:

---

[17] AbbVie Inc., *2019 Form 10-K* (Feb. 21, 2020) (online at https://investors.abbvie.com/sec-filings/sec-filing/10-k/0001551152-20-000007); Pfizer Inc., *2019 Form 10-K* (Feb. 27, 2020) (online at https://investors.pfizer.com/financials/sec-filings/sec-filings-details/default.aspx? FilingId= 13958533); Eli Lilly and Company, *2019 Form 10-K* (Feb. 19, 2020) (online at https://investor. lilly.com/static-files/34d71960-241f-4160-bd20-86fb85df4def); Novartis Pharmaceuticals Corporation, *2019 Form 20-F* (Jan. 29, 2020) (online at www.sec.gov/edgar/browse/?CIK=-000 1114448&owner=include); Mallinckrodt Pharmaceuticals, *2019 Form 10-K* (Feb. 26, 2020) ( online at www.mallinckrodt.com/investors/sec-filings/); Bristol Myers Squibb, *2019 Form 10-K* (Feb. 24, 2020) ( online at https://d18rn0p25nwr6d.cloudfront.net/CIK-0000014272/468bfaba-6810-4cec-80b5-94aa4c7a523.pdf); Sanofi, *2019 Form 20-F* (Mar. 5, 2020) (online at www.sanofi.com/en/investors/reports-and-publications/financial-and-csr-reports); Novo Nordisk Inc., *2019 Form 20-F* (Feb. 5, 2020) (online at www.sec.gov/edgar/browse/?CIK=0000353278); Amgen Inc., *2019 Form 10-K* (Feb. 12,2020) ( online at https://investors.amgen.com/financials/sec-filings); Teva Pharmaceutical Industries Ltd., *2019 Form 10-K* (Feb. 21, 2020) (online at https://ir.tevapharm.com/financials/sec-filings/default.aspx). To calculate these figures for companies using foreign companies using foreign currencies, Committee staff used exchange rates current as of December 31, 2020.

**Figure 7: Executive Committee Compensation, 2016-2020**

| Company | Total |
|---|---|
| AbbVie | $ 347,697,413 |
| Amgen | $ 240,436,746 |
| Celgene/BMS* | $ 260,140,942 |
| Eli Lilly | $ 234,015,759 |
| Mallinckrodt | $ 160,784,443 |
| Novartis | $ 320,585,194 |
| NovoNordisk | $ 124,812,234 |
| Pfizer | $ 287,751,046 |
| Sanofi | $ 60,467,284 |
| Teva | $ 195,881,480 |
| Total | $ 2,232,572,540 |

*Reflects data from Celgene for 2016, 2017, and 2018 and data from Bristol Myers Squibb for 2019 and 2020. Bristol Myers Squibb acquired Celgene in 2019. Calculated using exchange rates from December 31, 2020.*

**G.     Drug Companies Target the U.S. Market for Higher Prices and Use the Medicare Program to Boost Revenue**

78.     The Committee's investigation uncovered new evidence showing how the pharmaceutical industry has exploited the federal law prohibiting the Secretary of the Department of Health and Human Services (HHS) from directly negotiating with drug companies to lower drug prices in the Medicare Part D program. Internal strategy documents show that drug companies targeted the U.S. market for price increases—while maintaining or lowering prices in the rest of the world—in part because Medicare cannot negotiate directly. A draft internal Pfizer presentation from 2016 explicitly linked Pfizer's profitability across the globe to its ability to raise prices in the United States, noting that growth was driven by "price increases in the U.S." In a 2016 strategy presentation, executives from Teva, which sells the multiple sclerosis drug Copaxone, described one of the company's key strengths as its ability to "increase prices successfully," which was "influenced heavily by US [Teva's U.S. Business] being allowed to hike prices." A presentation prepared for Celgene's pricing committee noted that a key strategy for Celgene to "win" in its

cancer franchise Revlimid was to "[p]rotect free-market competition-based pricing for Medicare and commercial insurance" in the United States.

     79.    The Committee obtained non-public pricing data revealing how the Medicare program has lost out on savings because Medicare Part D plans have failed to secure the same generous rebates or discounts as other federal health care programs that negotiate directly with drug companies. The Committee's analysis found that taxpayers could have saved more than $25 billion over a five-year period for just seven of the drugs investigated—Humira, Imbruvica, Sensipar, Enbrel, Lantus, NovoLog, and Lyrica—if private Medicare Part D plans had obtained the same discounts as other federal health programs that are empowered to negotiate.[18] This loss in discounts is reflected in prices charged class members who are enrolled in Part D.

**Figure 8: Lost Medicare Savings for Seven Drugs, 2014–2018**[19]

| Drug | Medicare Part D Spending | Lost Medicare Savings |
|------|-------------------------:|----------------------:|
| Lantus | $ 11,583,098,197 | $ 9,246,511,550 |
| Humira | $ 10,907,732,233 | $ 6,136,305,246 |
| NovoLog | $ 3,627,264,339 | $ 2,946,198,492 |
| Enbrel | $ 6,160,200,000 | $ 2,353,170,600 |
| Lyrica | $ 7,254,607,375 | $ 1,816,950,556 |
| Imbruvica | $ 5,071,975,613 | $ 1,695,126,731 |
| Sensipar | $ 3,664,400,000 | $ 948,124,100 |
| **Total** | $ 48,269,277,757 | $ 25,142,387,275 |

---

[18] These figures include comparisons of rebate data between Medicare and the Department of Defense (DOD) and the Department of Veterans Affairs (VA). For some drugs, including Imbruvica, Gleevec, and Lyrica, these figures represent the average rebates or discounts offered to both DOD and the VA. For other drugs, these figures include only rebates or discounts offered to one agency.

[19] For three drugs—Lantus, NovoLog, and Lyrica—this figure represents net Medicare Part D expenditures. For the other drugs—Humira, Enbrel, Imbruvica, and Sensipar—this figure represents gross Medicare Part D expenditures.

**H.      AbbVie and Other Drug Companies Use Patient Assistance Programs as a Public Relations Tool to Boost Sales**

80.      In responding to criticism of their pricing practices, drug companies often highlight the generosity of their patient assistance programs. However, the Committee's investigation uncovered new evidence that companies emphasized the significant returns on investment from these programs in the form of increased sales, particularly for drugs approaching loss of exclusivity. The Committee obtained internal discussions and strategy documents in which companies, including Teva and Novartis, emphasized the rates of return of their copayment assistance programs for commercial patients. Internal Pfizer documents emphasized that its copayment program encouraged patients to stay on branded Lyrica even after the entry of generic competition. Internal documents suggest that companies also used donations to third-party foundations that subsidize copayment and other cost-sharing obligations for Medicare Part D patients as a way to generate sales. For example, internal documents from both Teva and AbbVie indicate that these donations were intended to drive sales or attract patients who otherwise might not have used the companies' drugs.

81.      Although internal documents show that companies view these programs as an important public relations tool, internal data obtained by the Committee confirms that companies' spending on patient assistance programs is minimal compared to the enormous amount of revenue brought in by these drugs. For example, the total cost of Pfizer's patient assistance program expenditures related to Lyrica from 2015 to 2017 was equivalent to less than one-tenth of one percent of Pfizer's net U.S. revenue from Lyrica over the same period. These programs often do not provide sustainable support for patients and do not address the burden that the company's pricing practices have placed on the U.S. health care system. The Committee

obtained hundreds of pages of patient complaints describing how high drug prices have harmed them and their loved ones.

## I.     Research and Manufacturing Costs Do Not Justify Price Increases

82.     The Committee's investigation revealed that justifications frequently offered by the pharmaceutical industry for raising prices—including research and development (R&D), manufacturing, and other costs—are unsupported. The Committee's investigation found that revenue gains far outpace companies' investments in R&D. For example, in response to the Committee's request, Humira has the largest discrepancy between revenue and research and development costs.

**Figure 10: Comparison of Net Revenue and R&D Expenditures for Seven Drugs**



83.     The Committee's investigation also found that even if the pharmaceutical industry collected less revenue due to pricing reforms, drug companies could maintain or even exceed their

current R&D expenditures if they reduced spending on stock buybacks and dividends. From 2016 to 2020, the 14 leading drug companies spent $577 billion on stock buybacks and dividends—$56 billion more than they spent on R&D over the same period.[20]

## J.  Drug Manufacturer Manipulation of PBM Incentives

84.     PBMs turn a profit in two primary ways relevant here: First, their health insurer clients pay them service fees for processing prescriptions and operating mail-order pharmacies. Second, PBMs take a cut of the drug price discounts they negotiate with drug companies (with the rest sometimes passed on to their health insurer clients). The manufacturers' "rebate" arrangements are meant to incentivize PBMs to negotiate lower *real* drug prices. But the manufacturers know that this business model can be manipulated such that PBMs no longer have an incentive to control costs.

85.     PBMs have the greatest leverage to negotiate lower prices when drugs are FDA-approved as bioequivalent or biosimilar, i.e., when a drug "goes generic." But PBMs also have leverage when two or more drug companies manufacture drugs that, while not bioequivalent or biosimilar, are nevertheless in the same therapeutic class and are perceived to have similar efficacy and risk profiles. In such a scenario, the drug companies should compete for formulary access by lowering their list prices.

86.     But defendant has found a way to game this system. Defendant has realized that the net and list price spread can be enlarged by *raising list prices* while holding *net prices constant* (or

---

[20] Data was compiled based on information from annual reports, proxy and other documents from AbbVie, Amgen, AstraZeneca, Bristol Myers Squibb, Eli Lilly, Gilead, GlaxoSmithKline, Johnson & Johnson, Merck, Novartis, Novo Nordisk, Pfizer, Roche, and Sanofi. These 14 companies were the largest pharmaceutical companies by market capitalization in Q1 2021. *Q1 2021: A Look at Biopharma's Top 25 Companies by Market Cap*, Bio Space (May 3, 2021) (online at www.biospace.com/article/q1-2021-an-in-depth-look-at-biopharma-s-top-25-/).

decreasing them slightly). In exchange for this spread enlargement, the PBMs agree with the manufacturer, either explicitly or implicitly, to favor, or at least not disfavor, the drug with the most elevated list price. AbbVie knows that when they increase the list prices of its drug, the PBMs can earn substantially greater revenues so long as net prices remain constant.

87. The perverse, reverse incentives for larger list prices (and consequent consumer overpayments) were described in a recent report on the drug industry:

> At the whole-market level, we sense that the price protection rebate arbitrage game is driving manufacturers to higher list price increases than would otherwise occur, particularly on the eve of a general election. Price protection rebates between brand manufacturers and PBMs are common, as are fixed rebate agreements between PBMs and a significant portion of their plan sponsors. When brand manufacturers' [list price] increases exceed the price protection threshold, the manufacturers rebate the difference to PBMs, who pocket the difference when these price protection rebates grow faster than the PBMs' fixed rebate commitments to plan sponsors. Thus all else equal in a given category, the product with the more rapid list price increases is more profitable to the PBM. Manufacturers, realizing this, don't want their products disadvantaged, and accordingly are driven to keep their rates of list price inflation at least as high, and ideally just a bit higher, than peers'. Durable list price inflation is the natural result. Net price inflation is unaffected, but unit volumes suffer as higher list prices directly impact consumers who have not yet met their deductibles.[21]

88. This is not the first time that manipulation of the spread between list and net prices has been the subject of large-scale litigation. In *New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, 244 F.R.D. 79 (D. Mass. 2007), the District Court for the District of Massachusetts certified a class alleging that McKesson, a wholesaler, and First Data, a drug price publisher, engaged in a scheme to inflate the list prices of brand name drugs. McKesson asserted that a class could not be certified because the PBMs had become aware of the phony increase in the spread, and promptly acted to offset the spread by vigorously seeking rebates for its health insurer clients.

---

[21] Richard Evans, Scott Hinds, & Ryan Baum, *US Rx Net Pricing Trends Thru 2Q16*, SSR LLC, 36 (Oct. 5, 2016).

However, part of the evidence the district court relied upon in rejecting this argument was evidence showing that the PBMs pocketed a portion of the increase in the spread at the expense of consumers and health insurers:

> Because these PBMs benefited from the increased [list price] spreads perpetuated by the Scheme, Plaintiffs argue that they had no incentive to inform [third party payers] of the inflated AWP, let alone fiercely compete to mitigate any damage. As proof, Plaintiffs quote an April 26, 2002 internal ESI e-mail, sent around the same time as the ESI letter, that states that "the AWP increases being pushed through by First Data Bank [are] having a very favorable impact on our mail margins." The e-mail goes on to state, "Our clients will not be sympathetic to our financial situation since we [will have benefited] from the AWP increase in the mail and they hired us to control drug trend." The e-mail includes a handwritten note, in response, "Let's put a lid on it and not make it a big deal."[22]

89.     Just so, AbbVie has used the phony list prices to its advantage by using unfair and unconscionable spread between prices to provide kickbacks to PBMs in exchange for formulary status. Indeed, as the District Court for the District of Massachusetts explained, rebates are really "direct kickbacks," "disguised as market-share discounts and rebates."[23] This "rebate" scheme enables AbbVie to maintain preferred formulary positions without reducing its net prices.

90.     And the PBMs benefit from the larger spreads. The PBMs boast of the "increased rebates" they have achieved, when, in reality, the "discounts" they have obtained are simply reductions off artificially-inflated list prices. In other words, these "discounts" are not discounts at all.

91.     The losers in this scheme are Humira consumers. When AbbVie publishes unfair and unconscionable list prices so that it can offer PBMs larger spreads, it harms: uninsured

---

[22] *New England Carpenters Health Benefits Fund v. First Data Bank, Inc.*, 248 F.R.D. 363, 368 (D. Mass 2008) (internal citations omitted).

[23] *United States ex rel. Banigan v. Organon USA Inc.*, No. CV 07-12153-RWZ, 2016 WL 6571269, at *1 (D. Mass. Jan. 20, 2016).

patients, insured consumers in high deductible plans, insured consumers paying coinsurance, and insured consumers in Medicare Part D plans, especially those who reach the Donut Hole, all who pay for Humira based on AbbVie's *list* prices. Defendant was well aware of the impact of its list prices on consumers.

## K.    AbbVie—Humira

92.    Humira is a biologic sold by AbbVie for the treatment of rheumatoid arthritis and other painful inflammatory diseases. Humira is priced at $77,586 for a standard annual course of treatment and generated $14.9 billion in U.S. net revenue in 2019.[24]

93.    Abbott and AbbVie have raised the price of Humira 27 times since it was brought to market.

94.    In 2003, Abbott Laboratories launched Humira at a price of $522 per 40 mg syringe, or approximately $12,000 annually. Over the next decade, Abbott raised the drug's price 13 times, nearly doubling its price to $1,024.31 per syringe, or approximately $24,000 annually, by the end of 2012.[25]

95.    When AbbVie spun off as its own company in January 2013, it continued to raise Humira's price, taking an additional 14 price increases in just over eight years, including a

---

[24] IBM Micromedex Redbook, *Wholesale Acquisition Cost and Average Wholesale Price History for Humira*. The annual calculation is for a patient who injects Humira every other week. AbbVie Inc., *2019 Form 10-K* (Feb. 21, 2020) (online at https://investors.abbvie.com/sec-filings/sec-filing/10-k/0001551152-20-000007).

[25] Most patients require one injection of this size on a biweekly basis. AbbVie Inc., *Humira (Adalimumab): Moderate to Severe Rheumatoid Arthritis* (online at www.humira.com/rheumatoid-arthritis/after-starting-treatment) (accessed Nov. 1, 2021); IBM Micromedex Redbook, *Wholesale Acquisition Cost and Average Wholesale Price History for Humira*.

combined 30% increase in one ten-month period.[26] Humira is now priced at $2,984 per syringe, or more than $71,960 annually. The price of Humira has increased by almost 500% since launch.[27]

96.     Figure 12 below shows the price of a 40 mg syringe of Humira from launch to 2021 (with patients typically requiring two syringes per month).

**Figure 12: Humira Price Increases**



97.     As of 2023, the list price for Humira is now approximately $7,000 per month.

98.     AbbVie has collected more than $170 billion in worldwide net revenue from Humira since 2003. Nearly two-thirds, or $107 billion, has come from the U.S. market.[28] Since

---

[26] This ten-month period was from March 31, 2015, when the price of one Humira injection was $1,456, to January 21, 2016, when Humira was priced at $1,898.

[27] IBM Micromedex Redbook, Wholesale Acquisition Cost and Average Wholesale Price History for Humira.

[28] Letter from Gibson, Dunn and Crutcher LLP, on behalf of AbbVie Inc., to Chairman Elijah E. Cummings, House Committee on Oversight and Reform (Feb. 4, 2019); Letter from Gibson, Dunn and Crutcher LLP, on behalf of AbbVie Inc., to Chairwoman Carolyn B. Maloney, House

2014, Humira has been the best-selling drug in the United States. In 2020, AbbVie generated $16.1 billion in net U.S. revenues from Humira.[29] This was nearly double the net revenue generated by the second-best-selling drug in the United States—Keytruda, marketed by Merck & Co.[30]

99.     AbbVie and Amgen also engaged in shadow pricing for their products Humira and Amgen's drug, Enbrel. One Amgen pricing committee presentation prepared in May 2016 described Amgen's pricing strategy for Enbrel: "Price increase strategy is to follow AbbVie's price increases." In December 2017, while approving a planned 4.9% Enbrel price increase for the end of the year, Amgen's then-Executive Vice President and Head of Global Commercial Operations told his team, "[Y]ou have authorization to proceed with a competitive price increase for Enbrel— should Humira pull the trigger at any point." This shadow pricing is part of the list price scheme discussed here and was internally tracked by AbbVie as shown from an internal AbbVie document:

---

Committee on Oversight and Reform (Jan. 14, 2021); Abbott Laboratories, *2003–2013 Form 10-K* (online at www.abbottinvestor.com/financials/sec-filings); AbbVie Inc., *2013–2020 Form 10-K* (online at https://investors.abbvie.com/sec-filings).

[29] AbbVie Inc., *2020 Form 10-K* (Feb. 3, 2021) (online at abbvie.com/static-files/47512e94-a9a4-4035-8dbc-6eb59116bb05).

[30] Merck & Co., Inc., *2020 Form 10-K Annual Report* (Feb. 25, 2021) (online at www.merck.com/investur-relations/financial-infomation/sec-filings/).

**Figure 9: Comparison of Humira and Enbrel Prices for Annual Course of Treatment, 2013—2021**



100.    Another internal chart depicts the shadow pricing strategy:



101.     Figure 13 below reflects AbbVie's net U.S. revenue for Humira over time as a direct

result of the pricing practices described herein.[31]

---

[31] Letter from Gibson, Dunn and Crutcher LLP, on behalf of AbbVie Inc., to Chairman Elijah E. Cummings, House Committee on Oversight and Reform (Feb. 4, 2019); Letter from Gibson, Dunn and Crutcher LLP, on behalf of AbbVie Inc., to Chairwoman Carolyn B. Maloney, House Committee on Oversight and Reform (Jan. 14, 2021); Abbott Laboratories, *2003–2013 Form* 10-K (online at www.abbottinvestor.com/financials/sec-filings); AbbVie Inc., *2013–2020 Form 10-K* (online at https://investorsabbvie.com/sec-filings).

**Figure 13: AbbVie's Net U.S. Revenue for Humira, 2003-2020**



102.     Figure 15 shows Humira's overall annual net price across all channels, compared to the drug's list price, from 2009 to 2018.[32]

---

[32] Letter from Gibson, Dunn and Crutcher LLP, on behalf of AbbVie Inc., to Chairwoman Carolyn B. Maloney, House Committee on Oversight and Reform (Sept. 11, 2020).

**Figure 15: Humira (AbbVie)—Average Net Price of a Bi-Weekly Dose, 2009—2018**



103.     And, as seen below, Humira's list price far exceeds price increases of other major spending categories:



104.     As noted, and further described, AbbVie's price increase was not only untethered

to costs, and tied to the rebate gain described above, but were also tied to shadow prices. Rather

than price below its competitor for arthritis, Enbrel, AbbVie engaged in shadow pricing.

## V.     EXECUTIVE COMPENSATION CREATED INCENTIVES FOR PRICE INCREASES

105.     From 2016 to 2020, the drug companies investigated by the House Committee

spent over $2.2 billion on compensation for their highest-paid executives, reflecting an increase of

20% over that period. Figure 14 shows spending on executive compensation from 2016 to 2020

with AbbVie at the top.

### Figure 14: Executive Committee Compensation, 2016—2020[33]

| Company | 2016 | 2017 | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|---|
| AbbVie | $ 60,882,843 | $ 70,379,456 | $ 62,100,858 | $ 69,440,776 | $ 84,893,480 | $ 347,697,413 |
| Amgen | $ 42,667,038 | $ 39,889,202 | $ 64,081,235 | $ 46,720,094 | $ 47,097,177 | $ 240,436,746 |
| Celgene/BMS* | $ 57,259,531 | $ 43,935,336 | $ 52,135,701 | $ 58,455,527 | $ 48,354,847 | $ 260,140,942 |
| Eli Lilly | $ 42,744,525 | $ 47,004,080 | $ 43,440,949 | $ 49,965,840 | $ 50,860,365 | $ 234,015,759 |
| Mallinckrodt | $ 24,601,580 | $ 41,788,828 | $ 29,074,987 | $ 32,439,953 | $ 32,879,095 | $ 160,784,443 |
| Novartis | $ 59,907,420 | $ 51,794,638 | $ 72,292,820 | $ 72,475,721 | $ 64,113,595 | $ 320,585,194 |
| NovoNordisk | $ 15,041,355 | $ 14,576,159 | $ 28,283,950 | $ 33,106,488 | $ 33,804,283 | $ 124,812,234 |
| Pfizer | $ 49,509,982 | $ 64,225,035 | $ 50,735,513 | $ 63,848,586 | $ 59,431,930 | $ 287,751,046 |
| Sanofi | $ 11,703,467 | $ 11,809,802 | $ 9,012,420 | $ 14,228,276 | $ 13,713,319 | $ 60,467,284 |
| Teva | $ 24,601,580 | $ 51,934,561 | $ 55,878,722 | $ 31,456,387 | $ 31,713,550 | $ 195,881,480 |
| **Total** | **$ 388,919,321** | **$ 437,337,096** | **$ 467,037,205** | **$ 472,137,647** | **$ 466,843,641** | **$ 2,232,572,540** |

*Reflects data from Celgene for 2016, 2017, and 2018, and data from Bristol Myers Squibb from 2019 and 2020. Bristol Myers Squibb acquired Celgene in 2019.*

106.     AbbVie paid CEO Richard Gonzalez nearly $170 million between 2013 and 2020,

as AbbVie raised the price of Humira 14 times from approximately $1,000 per syringe to nearly

$3,000 per syringe.[34]

107.     Since separating from Abbott in 2013, AbbVie has paid its highest-ranking

executives over $480 million in compensation, including bonuses tied to revenue targets. For

---

[33] *Id.*

[34] *See* AbbVie Inc., *Proxy Statements* (2013-2020) (online at www.sec.gov/cgi-bin/browse-edgar?
CIK=1551152); IBM Micromedex Redbook, *wholesale Acquisition Cost and Average Wholesale Price
History for Humira.*

example, AbbVie's 2019 compensation plan tied bonus payments to net revenue and pre-tax income targets, accounting for as much as 80% of the bonus calculation for AbbVie executives.[35] AbbVie barely met its net revenue target of $33.3 billion that year, achieving 101% of its target. Without raising the prices of Humira and Imbruvica by 6.2% in 2019, the Committee estimates that AbbVie would have missed this target.[36] Because AbbVie met its income and revenue targets, AbbVie's senior-most executives were paid $70 million in 2019.[37]

108.    As part of AbbVie's "short-term incentives," executives were compensated based on whether the company achieved predetermined targets for "Humira Sales."[38] In 2014—the year before this incentive was introduced—Humira's U.S. net revenue was $6.5 billion.[39] The following year, after the incentive was introduced, AbbVie executives implemented a 9.9% Humira price increase in April—the largest-ever price increase for the drug—and an additional 7.9% price increase in August. The period following the introduction of this incentive coincided with AbbVie's largest price increase in Humira's history—over 30% in ten months.[40] Humira's U.S. net revenue increased to $8.4 billion in 2015, the largest one-year increase to date.[41]

---

[35] *See* AbbVie Inc., *2019 Proxy Statement* (Mar. 22, 2019) (online at https://investors.abbvie.com/static-files/a7335bdf-48b2-44a2-b0bd-21 ec26843d05).

[36] Committee staff estimate that without these price increases and assuming a corresponding change in net price of the products, AbbVie worldwide net revenue would have fallen to $32.1 billion, below the company's target of $33.3 billion. *See* AbbVie Inc., *2019 Form 10-K* (Feb. 21, 2020) (online at https://investors.abbvie.com/sec-filings/sec-filing/10-k/0001551152-20-000007).

[37] *See* AbbVie Inc., *2020 Proxy Statement* (Mar. 23, 2020) (online at https://investors.abbvie.com/secfilings/sec-filing/def-14a/0001047469-20-001710).

[38] *See* AbbVie Inc., *2013-2020 Proxy Statements* (online at www.sec.gov/cgi-bin/browse-edgar?CIK=1551152).

[39] AbbVie Inc., *2014 Form 10-K* (Feb. 20, 2015) (online at https://investors.abbvie.com/static-files/9553e87d-3b88-4b34-be3d-e1ff94c89bfa).

[40] IBM Micromedex Redbook, *Wholesale Acquisition Cost and Average Wholesale Price History for Humira*.

[41] *Id.*

109.    In 2018—the final year of the incentive—Mr. Gonzalez was paid $21.2 million in compensation.

## VI.    PRICE INCREASES NOT JUSTIFIED BY MANUFACTURING COSTS AND ARE OUT OF VARIANCE WITH THE COST OF CONSUMER GOODS

110.    Pharmaceutical companies cite the cost of manufacturing and other commercial expenses to justify their pricing practices. The House Committee found that, however, internal data obtained by the Committee reveal that manufacturing costs for some companies rose at a significantly slower rate than the companies' price increases for the drugs. In some instances, manufacturing costs even declined over the period for which the companies provided data. For all of the companies, the drugs' revenues dwarfed their respective manufacturing costs.

111.    From 2009 to 2018, AbbVie collected $121 billion in net worldwide revenue from Humira.[42] AbbVie reported to the Committee that the cost of producing and selling Humira for that same period totaled $13.9 billion, equivalent to 11% of AbbVie's net revenues from Humira in the same period.[43/44]

112.    And as noted, AbbVie's cost increase far exceeds increases in the cost of other major expense categories:

---

[42] AbbVie Inc., *2019 Form 10-K* (Feb. 21, 2020) (online at https://investors.AbbVie.com/sec-filing/10-k/0001551152-20-000007); AbbVie Inc., *2016 Form 10-K* (Feb. 17, 20 17) (online at https://investors AbbVie.com/node/10016/html); AbbVie Inc., *2015 Form 10-K* (Feb. 19, 2016) (online at https://investors.AbbVie.com/node/9521/html). Committee staff were unable to provide a similar analysis for Imbruvica because of complexities related to cost sharing and worldwide revenue due to AbbVie' s collaboration with Janssen.

[43] Letter from Gibson, Dunn and Crutcher LLP, on behalf of AbbVie Inc., to Chairwoman Carolyn B. Maloney, House Committee on Oversight and Reform (Sept 11, 2020).

[44] *Id.*; IBM Mocromedex Redbook, *Wholesale Acquisition Cost and Average Wholesale Price History for Humira*. This calculation is based on the wholesale acquisition cost of a 40mg syringe on Sept. 2, 2009, ($1,523.97) and Jan. 1, 2018, ($4,872.03).



## VII. IMPACT ON CONSUMERS OF UNFAIR AND UNCONSCIONABLE LIST PRICES

113.    Defendant and its collaborators have exploited the drug pricing and payment system, forcing patient consumers to pay drastically higher prices for Humira than their insurers (if they have insurance). If a patient is uninsured, she is required to pay *full*, *point-of-sale prices* (based on list prices); if a patient is responsible for all of her drugs' costs before she hits her deductible, she is required to pay *full*, *point-of-sale prices* (based on list prices) until she meets her deductible; if a patient pays coinsurance, she pays for a percentage of her drugs' *point-of-sale prices* (based on list prices); if the patient is in a Medicare Part D plan, she pays based on list price before she meets her deductible, and then pays between 25% and 40% of *point-of-sale prices* (based on list prices).

114.    In the case of Humira, AbbVie's publicly reported list prices, used for consumer transactions, have climbed further and further away from the net prices that institutional payers

pay. The net prices of Humira to PBMs and insurers are much lower: 35%, 40%, or even 50% lower than list prices.

115.     The impact on class members is illustrated by the fact that many patients have to stop taking Humira because they can't afford it. The New York Times depicted this as follows:[45]

> Some Medicare patients have been suffering as a result.
>
> Sue Lee, 80, of Crestwood, Ky., had been taking Humira for years to prevent painful sores caused by a chronic skin condition known as psoriasis. Her employer's insurance plan had helped keep her annual payments to $60. Then she retired. Under Medicare rules, she would have to pay about $8,000 a year, which she could not afford.
>
> "I cried a long time," she said. For months, Lee stopped taking any medication. The sores "came back with a vengeance," she said. She joined a clinical trial to temporarily get access to another medication. Now she is relying on free samples of another drug provided by her doctor. She doesn't know what she'll do if that supply runs out.
>
> AbbVie executives have acknowledged that Medicare patients often pay much more than privately insured people, but they said the blame lays with Medicare. In 2021 testimony to a congressional committee investigating drug prices, AbbVie CEO Richard Gonzalez said the average Medicare patient had to pay $5,800 out of pocket annually. (AbbVie declined to provide updated figures.) He said AbbVie provided the drug for virtually nothing to nearly 40% of Medicare patients.
>
> The drug's high price is also taxing employers.

## VIII.   TOLLING OF THE STATUTE OF LIMITATIONS

**A.      Discovery Rule Tolling**

116.     The plaintiffs and class members had no way of knowing about AbbVie's scheme with respect to Humira.

---

[45] https://www.nytimes.com/2023/01/28/business/humira-abbvie-monopoly.html.

117.    Pricing in the pharmaceutical drug market suffers from "a lack of transparency," as "[t]he size of manufacturer rebates and the percentage of the rebate passed on to health plans and patients are secret."[46] Given that AbbVie and PBMs refuse to disclose the net prices of Humira, labeling them trade secrets, a reasonable plaintiff and consumer could not discover the truth about the conduct central to this case.

118.    One must know "[r]eal transaction prices, including rebates and discounts at each stage [of the supply chain]," to properly understand how AbbVie subverted competition to reap hundreds of billions in profits at the expense of the patients. And even with states passing legislation to improve price transparency, Humira's "true transaction prices" remain unknown to consumers and the Class.[47]

119.    Because of this, the U.S. House of Representatives Committee on Oversight and Reform expressed frustration at its inability to examine the scope and nature of AbbVie's pricing practices, absent a Congressional subpoena.[48]

120.    Even practicing physicians struggle to understand the complexities of drug pricing and how list prices, PBMs, and secret rebates impact what patients pay. According to a study evaluating physician knowledge of formularies and out-of-pocket costs, "[p]hysicians often lack the knowledge to assist patients in the management of their out-of-pocket costs for prescription drugs

---

[46] The Council of Economic Advisors, Executive Office of the President of the United States, *Reforming Biopharmaceutical Pricing at Home and Abroad* (Feb. 2018).

[47] Martha S. Ryan and Neeraj Sood, "Analysis of State-Level Drug Pricing Transparency Laws in the United States," JAMA NETWORK OPEN, at 2 (Sept. 25, 2019).

[48] U.S. House of Representatives Committee on Oversight and Reform, "Drug Pricing Investigation: AbbVie—Humira and Imbruvica," at i (May 2021).

and they depend on pharmacists to help patients manage those costs."[49] In fact, "[o]nly 20% of physicians reported that they were usually or always familiar with pharmacy benefit structures (ie, 1 tier, 3 tier, coinsurance), and only 19% were usually or always familiar with patients' out-of-pocket cost requirements."[50] In another study, 80% of physicians surveyed reported being unaware of actual drug costs, only 33% claimed to have easy access to the drug cost data, and only 13% had formal education regarding drug costs.[51]

121.    Within the period of any applicable statutes of limitation, the plaintiffs and class members could not have discovered, through reasonable diligence, that AbbVie was concealing the unfair and unconscionable conduct complained of herein.

122.    The plaintiffs and the class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that AbbVie was engaged in the unfair and unconscionable scheme and was publishing phony list prices, nor would a reasonable and diligent investigation have disclosed the truth.

123.    For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims identified herein.

---

[49] William H. Shrank, et al., *Physicians' Perceived Knowledge of and Responsibility for Managing Patients' Out-of-Pocket Costs for Prescription Drugs*, 40 THE ANNALS OF PHARMACOTHERAPY 1534, 1534 (2006).

[50] *Id.* at 1536.

[51] Steven Reichert, MD, Tod Simon, MD, and Ethan A. Halm, MD, MPH, *Physicians' Attitudes About Prescribing and Knowledge of Costs of Common Medications*, 160 ARCHIVES OF INTERNAL MEDICINE 2799, 2800-01 (Oct. 9, 2000).

**B.      Fraudulent Concealment Tolling**

124.      All applicable statutes of limitation have also been tolled by AbbVie's knowing and active concealment and denial of the facts alleged herein throughout the period relevant to this action.

125.      Not only has AbbVie kept its net prices and pricing practices secret, but it has also actively taken steps to prevent its actions from becoming public. In 2019, the U.S. House of Representatives Committee on Oversight and Reform requested information and documents from AbbVie related to its pricing of Humira. But, in the words of the Committee, "AbbVie obstructed the Committee's investigation."[52] It was only after the Committee threatened AbbVie with a Congressional subpoena following its refusal to cooperate, did AbbVie finally begin "to produce long overdue materials in response to the Committee's requests."[53] The Committee did not release its report until May 2021.

126.      AbbVie's obstruction of the Committee's investigation demonstrates its desire to conceal its pricing practices from public scrutiny. It also demonstrates the inability of the plaintiffs and class members to discover AbbVie's conduct. AbbVie's fraudulent concealment therefore tolls any applicable statute of limitations.

**C.      Estoppel**

127.      AbbVie had a continuous duty to disclose to the plaintiffs and class members the true character, quality, and nature of the list prices upon which their payments for Humira were

---

[52] U.S. House of Representatives Committee on Oversight and Reform, "Drug Pricing Investigation: AbbVie—Humira and Imbruvica," at i (May 2021).

[53] *Id.*

based. As noted above, not only did AbbVie fail to disclose such information, it actively thwarted any attempts by lawmakers or the public to discover the same.

128.     Based on the foregoing, AbbVie is estopped from relying on any statutes of limitations in defense of this action.

## IX.     CLASS ACTION ALLEGATIONS

129.     The plaintiffs bring this action on behalf of themselves and all others similarly situated under Federal Rule of Civil Procedure 23(a) and (b)(3), as representative of a class defined as follows:

> All individual persons in the United States and its territories who:
> (1) paid any portion of the purchase price for a prescription of
> Humira at a price calculated by reference to a list price, AWP
> (Average Wholesale Price), and/or WAC (Wholesale Acquisition
> Price) for purposes other than resale or (2) stopped taking
> prescription Humira after they lost insurance coverage because they
> would have had to pay any portion of the purchase price for a
> prescription of Humira at a price calculated by reference to a list
> price, AWP (Average Wholesale Price), and/or WAC (Wholesale
> Acquisition Price) for purposes other than resale.

130.     The class period is tolled to the earliest date of AbbVie's initiation of the scheme described herein, wherein AbbVie artificially inflated the list prices of Humira to offer PBMs higher spreads in exchange for preferred formulation status (the spread scheme).

131.     Excluded from the class are: (a) the legal representatives, officers, directors, assignees, and successor of AbbVie and any entity in which it has a controlling interests; and (b) any co-conspirators of AbbVie and the officers, directors, management, and employees of any such co-conspirators.

132.     There are a number of ways in which an individual person may pay a portion of the list price of Humira and thereby gain inclusion in the class. First, a person may be uninsured and,

therefore, responsible for paying 100% of the cost of Humira based on AbbVie's list prices (the uninsured scenario). Second, a person's insurance plan may require her to satisfy a deductible before insurance benefits cover all or a portion of her prescription needs. If so, that person is paying for 100% of the cost of her Humira based on AbbVie's list prices before she meets her deductible (the deductible scenario). Third, a person may have a coinsurance requirement. If so, that person is paying a portion of the cost of her Humira based on AbbVie's list prices (the coinsurance scenario). Fourth, a person may obtain insurance through a Medicare Part D Plan. If so, that person is paying a portion of the cost (or 100% of the cost before she meets her deductible) based on AbbVie's list prices (the Medicare Part D scenario).

133.    In each of these scenarios—the uninsured scenario, the deductible scenario, the coinsurance scenario, and the Medicare Part D scenario—a person's out-of-pocket expense for Humira is determined based on the list prices defendant unilaterally sets for Humira. Accordingly, each falls within the class definition.

134.    Members of the class are so numerous and geographically dispersed that joinder of all members is impracticable. Hundreds of thousands of prescriptions are written for Humira throughout the United States every week, and these prescriptions are filled by hundreds of thousands of individuals. The class is readily identifiable from information and records in the possession of AbbVie.

135.    The plaintiffs' claims are typical of the claims of the members of the class. The plaintiffs and all members of the class were damaged by the same wrongful conduct of AbbVie—i.e., as a result of defendant's misconduct, the plaintiffs and class members made unfair and unconscionable out-of-pocket payments for their Humira or, if they were unable to afford out-of-

pocket payments for Humira, suffered other actual damages, including physical suffering and out-of-pocket payments for drugs that are inferior to their physician-prescribed Humira.

136.     The plaintiffs will fairly and adequately protect and represent the interests of the class. Their interests are coincident with, and not antagonistic to, those of class members.

137.     Lead counsel that represents they are experienced in the prosecution of class action litigation and have particular experience with class action litigation involving pharmaceutical products and extensive experience in class actions concerning the use of list pricing, including two cases in federal district court (*AWP* and *McKesson*) that resulted in recoveries well in excess of $500 million.

138.     Questions of law and fact common to the members of the class predominate over questions that may affect only individual class members because AbbVie has acted on grounds generally applicable to the entire class, thereby making overcharge damages with respect to the class as a whole appropriate. Such generally-applicable conduct is inherent in AbbVie's wrongful conduct.

139.     Questions of law and fact common to the class include, but are not limited to:

    i.    Whether AbbVie engaged in unfair and/or unconscionable acts and practices by improperly publishing inflated list prices for Humira;

    ii.    Whether AbbVie unfairly and/or unconscionably inflated the list price of Humira to avoid competitive pressures and buy formulary access from PBMs without lowering its net price;

    iii.    What the list prices versus net (true average) prices for Humira are;

    iv.    Whether it was the policy and practice of AbbVie to prepare marketing and sales materials for PBMs that contained comparisons of their list prices and net prices for Humira and the spreads available;

    v.    Whether AbbVie engaged in a pattern and practice of paying illegal kickbacks, disguised as "rebates," to PBMs, such as CVS Health, Express

        Scripts, and OptumRX, that created substantial spreads between the list and net prices;

    vi.    Whether the large list-to-net price spreads were intended to induce CVS Health, Express Scripts, and OptumRX to give Humira placement on the PBMs' formularies;

    vii.    Whether AbbVie used unfairly and/or unconscionably inflated list prices as a starting point for negotiating these kickbacks or "rebates" for Humira;

    viii.    Whether the spread scheme caused the plaintiffs and class members to make inflated payments based on the unfair and/or unconscionable list prices for Humira or, if they are unable to afford out-of-pocket payments for Humira, caused them to suffer other actual damages, including physical suffering and out-of-pocket payments for drugs that are inferior to their physician-prescribed Humira; and

    ix.    Whether AbbVie is liable to the plaintiffs and the class members for damages flowing from its unfair and unconscionable conduct.

140.    The plaintiffs and class members have all suffered, and will continue to suffer, harm and damages as a result of AbbVie's unlawful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3). Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in the management of this class action. Absent a class action, the plaintiffs and class members would find the cost of litigating their claims to be prohibitive and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication. Additionally,

defendant has acted and failed to act on grounds generally applicable to the plaintiffs and the class, which requires uniform relief to ensure compatible standards of conduct toward the class, thereby making appropriate equitable relief to the class as a whole within the meaning of Rules 23(b)(2).

141.    The plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## X.    CLAIMS FOR RELIEF

### COUNT ONE

**VIOLATION OF THE ILLINOIS CONSUMER FRAUD
AND DECEPTIVE BUSINESS PRACTICES ACT
815 ILL. COMP. STAT. 505/1, *ET SEQ.*
(BROUGHT ON BEHALF OF A NATIONWIDE CLASS)**

142.    The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

143.    This claim is brought on behalf of all members of the class under the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA).

144.    The ICFA prohibits "unfair or deceptive acts or practices … in the conduct of any trade or commerce … whether any person has in fact been misled, deceived or damaged thereby."[54]

145.    That section also provides: "In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act."[55]

146.    Defendant is a "person" as that term is defined in 815 Ill. Comp. Stat. 505/1(c).

---

[54] 815 Ill. Comp. Stat. 505/2.
[55] *Id.*

147.    Illinois class members are "consumers" as that term is defined in 815 Ill. Comp. Stat. 505/1(e).

148.    "To determine whether a practice is unfair, Illinois courts consider three factors: whether it 'offends public policy'; is 'immoral, unethical, oppressive, or unscrupulous'; or 'causes substantial injury to consumers.' ... A plaintiff need not satisfy all three factors; '[a] practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.'"[56] AbbVie's conduct, as described in this complaint, constitutes "unfair" acts and practices in violation of the ICFA under all three factors.[57] In particular, the plaintiffs and class members suffered substantial injuries that they could not reasonably avoid and that were not outweighed by countervailing benefits to consumers or to competition.

149.    AbbVie's unfair acts and practices occurred in the conduct of trade or commerce, within the meaning of 815 Ill. Comp. Stat. 505/1(f).

150.    The ICFA applies to all claims by the plaintiffs and class members. AbbVie engaged in the challenged pricing conduct solely from their headquarters (and principal place of business) in Illinois, where it developed, recommended, and approved the strategies for Humira pricing at issue in this lawsuit. Moreover, AbbVie did not sell Humira to the plaintiffs or class members in their home states, make any representations to them at the point of sale in their home states, or have any business contacts with the plaintiffs and class members in their home states. Thus, the

---

[56] *See Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738–39 (7th Cir. 2019) (citations omitted).

[57] *See Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010) ("A plaintiff is entitled to recovery under ICFA when there is unfair or deceptive conduct .... A plaintiff may allege that conduct is unfair under ICFA without alleging that the conduct is deceptive.").

conduct challenged in this case took place "primarily and substantially in Illinois," so the ICFA applies to the claims of the plaintiffs and class members.[58]

151.    The ICFA allows "[a]ny person who suffers actual damage as a result of a violation of this Act committed by any other person [to] bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper ... ."[59] Under that provision, the plaintiffs seek monetary relief against defendant on their own and on behalf of all class members in the amount of actual damages, as well as punitive damages because defendant acted with fraud and/or malice and/or was grossly negligent. The plaintiffs and class members suffered actual damages by paying unfair and unconscionable out-of-pocket payments for their Humira or, if they were unable to afford out-of-pocket payments for Humira, suffered other actual damages, including physical suffering and out-of-pocket payments for drugs that are inferior to their physician-prescribed Humira.

152.    The plaintiffs also seek an order on behalf of themselves and all class members enjoining AbbVie's unfair acts and practices, attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. 505/1, *et seq.*

---

[58] *See Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011) (the ICFA "applies to nonresidents' claims when 'the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois'") (quoting *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 187 (2005)). *See id.* at 538 (reversing dismissal of IFCA claim because "if we can't say that the complaint and answer contain enough to point unerringly to Illinois law, we can say that the complaint does not *defeat* application of Illinois law").

[59] 815 Ill. Comp. Stat. 505/10a.

<u>COUNT TWO</u>

**VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION ACT
ALASKA STAT. ANN. § 45.50.471,** *ET SEQ.*

153.    The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

154.    This claim is brought on behalf of all Alaska residents who are class members.

155.    The Alaska Unfair Trade Practices and Consumer Protection Act prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce...." Alaska Stat. § 45.50.471(a).

156.    As alleged in this complaint, AbbVie's conduct with respect to Humira constitutes "unfair" acts and practices in violation of the Alaska Unfair Trade Practices and Consumer Protection Act.[60]

157.    AbbVie's unfair acts and practices occurred in the conduct of trade or commerce.

158.    "A person who suffers an ascertainable loss of money or property as a result of another person's act or practice declared unlawful by Alaska Stat. § 45.50.471 may bring a civil action to recover for each unlawful act or practice three times the actual damages or $500, whichever is greater. The court may provide other relief it considers necessary and proper." Alaska Stat. § 45.50.531(a).

---

[60] *See Merdes & Merdes, P.C. v. Leisnoi, Inc.*, 410 P.3d 398, 412 (Alaska 2017) ("When determining whether a practice is unfair under the broad prohibition of AS 45.50.471(a), we have adopted a 'multi-factored approach' that considers: '(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers....'") (citation omitted).

159.    Defendant is a "person" under Alaska Stat. § 45.50.531(a).

160.    The plaintiffs seek damages under Alaska Stat. § 45.50.531(a) for all ascertainable losses that Alaska class members suffered because of AbbVie's unfair acts and practices, including three times their actual damages.

161.    The plaintiffs further seek injunctive relief under Alaska Stat. § 45.50.531(a) on behalf of Alaska residents who are members of the class.

162.    On April 19, 2023, the plaintiffs sent a demand letter to defendant pursuant to Alaska Stat. § 45.50.531. Because AbbVie failed to make a written tender of settlement within the requisite period, the Alaska members of the class are entitled to injunctive relief.

<u>COUNT THREE</u>

**VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT
ARIZ. REV. STAT. ANN. § 44-1521, *ET SEQ.***

163.    The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

164.    This claim is brought on behalf of all Arizona residents who are class members.

165.    The Arizona Consumer Fraud Act prohibits the "act, use or employment by any person of any ... unfair act or practice ... in connection with the sale or advertisement of any merchandise...." Ariz. Rev. Stat. Ann. § 44-1522(A).

166.    AbbVie, the plaintiffs, and class members are "persons" within the meaning of Ariz. Rev. Stat. § 44-1521(6).

167.    Humira is "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5), which defines "merchandise" as "means any objects, wares, goods, commodities, intangibles, real estate or services." Ariz. Rev. Stat. Ann. § 44-1521.

168.    AbbVie's conduct, as set forth above, occurred in the conduct with the sale of merchandise.

169.    As alleged in this complaint, AbbVie's conduct with respect to Humira constitutes "unfair" acts and practices in violation of the Arizona Consumer Fraud Act, which provides that it "is the intent of the legislature, in construing subsection A, that the courts may use as a guide interpretations given by the federal trade commission and the federal courts to 15 United States Code §§ 45, 52 and 55(a)(1)." Ariz. Rev. Stat. Ann. § 44-1522(C).[61]

170.    Pursuant to the Arizona Consumer Fraud Act, the plaintiffs seek monetary relief against defendant for all compensable damages that Arizona class members suffered because of AbbVie's unfair acts and practices, in an amount to be determined at trial. The plaintiffs also seek punitive damages because AbbVie has engaged in conduct that is wanton, reckless, or shows spite or ill-will,[62] and/or acted with reckless indifference to the interests of others.[63]

171.    The plaintiffs also seek an order enjoining AbbVie's unfair acts and practices, attorneys' fees, and any other just and proper relief available under the Arizona statute.

---

[61] 15 U.S.C. § 45(n) provides that an act or practice is "unfair" if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. In determining whether an act or practice is unfair, the Commission may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination."

[62] *See Sellinger v. Freeway Mobile Home Sales, Inc.*, 110 Ariz. 573, 577 (1974); *Lufty v. R. D. Roper & Sons Motor Co.*, 57 Ariz. 495, 115 P.2d 161 (1941).

[63] *See Sellinger*, 110 Ariz. at 577; *McNelis v. Bruce*, 90 Ariz. 261 (1961).

<u>COUNT FOUR</u>

**VIOLATION OF THE CALIFORNIA LEGAL REMEDIES ACT**
**CAL. CIV. CODE § 1750, *ET SEQ.***

172.    The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

173.    This claim is brought on behalf of all California residents who are class members.

174.    The California Legal Remedies Act (CLRA) prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer."[64]

175.    Defendant is a "person" under Cal. Civ. Code § 1761(c).

176.    The California members of the class are "consumers," as defined by Cal. Civ. Code § 1761(d), who purchased Humira.

177.    As alleged in this complaint, AbbVie's conduct with respect to Humira constitutes "unfair" acts and practices in violation of the CLRA.

178.    The plaintiffs seek injunctive relief under the CLRA on behalf of California members of the class for AbbVie's violations of Cal. Civ. Code § 1770. On April 19, 2023, the plaintiffs sent a demand letter notifying AbbVie of such claims for relief pursuant to Cal. Civ. Code § 1782(d). Because AbbVie failed to remedy its unlawful conduct within the requisite period, and did not rectify its conduct within 30 days of the plaintiffs' original complaint, the plaintiffs seek all damages and relief to which they are entitled, including claims for:

       i.    Actual damages;

---

[64] Cal. Civ. Code § 1770(a).

      ii.     Restitution of money to the plaintiffs and class members, and the general public;

      iii.    Punitive damages;

      iv.    An additional award of up to $5,000 to each plaintiff and any class member who is a "senior citizen";

      v.     Attorney's fees and costs; and

      vi.    Other relief that this Court deems proper.

179.    The plaintiffs further seek an order on behalf of California members of the class enjoining AbbVie's unfair acts and for costs of court and attorneys' fees pursuant to Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

## COUNT FIVE

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*

180.    The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

181.    This claim is brought on behalf of all California residents who are class members.

182.    California Business and Professions Code § 17200 (UCL) prohibits "unlawful, unfair, or fraudulent business acts or practices."

183.    AbbVie violated the "unlawful" prong of § 17200 by its violations of the CLRA, as described above.

184.    In addition, AbbVie violated the "unfair" prong of § 17200.[65]

---

[65] *See Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) ("A business act or practice may violate the [UCL] if it is either unlawful, unfair, or fraudulent. Each of these three adjectives captures a separate and distinct theory of liability." (internal quotation marks and citation omitted)).

185.    The California courts have set out several definitions of unfairness. AbbVie's conduct is unfair under each of them:

      a.    "[T]he consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided."[66]

      b.    AbbVie's conduct "offends an established public policy [the FTC Policy Statement on Unfairness] or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."[67]

      c.    The plaintiffs' claim is predicated upon public policy which is "'tethered' to specific constitutional, statutory or regulatory provisions."[68]

186.    AbbVie's actions, as set forth above, occurred in the conduct of its business.

187.    Pursuant to Cal. Bus. & Prof. Code § 17203, the Court may "restore to any person in interest any money or property, real or personal, which may have been acquired by means of" a violation of the statute.

## COUNT SIX

### VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT
### COLO. REV. STAT. § 6-1-101, *ET SEQ.*

188.    The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

189.    This claim is brought on behalf of all Colorado residents who are class members.

---

[66] *See Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 839 (2006).

[67] *See West v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 780, 806 (2013) (quoting *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 719 (2001)).

[68] *See West*, 214 Cal. App. at 806 (quoting *Scripps Clinic v. Superior Court*, 108 Cal. App. 4th 917, 940 (2003)).

190.     The Colorado Consumer Protection Act (Colorado CPA) provides that a "person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person ... knowingly or recklessly engages in any unfair [or] unconscionable act or practice."[69]

191.     Defendant is a "person" under Colo. Rev. Stat. § 6-1-102(6).

192.     The plaintiffs and class members are "consumers" for purposes of Colo. Rev. Stat. § 6-1-113(1)(a).

193.     Defendant's conduct, as set forth above, occurred in the course of its business.

194.     As alleged in this complaint, AbbVie's conduct with respect to Humira constitutes unfair and unconscionable acts and practices in violation of the Colorado CPA.

195.     Under Colo. Rev. Stat. § 6-1-113, the plaintiffs seek monetary relief against AbbVie on behalf of the Colorado members of the class, measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages and (b) statutory damages in the amount of $500 for each plaintiff or class member. "In a case certified as a class action, a successful plaintiff may recover actual damages, injunctive relief allowed by law, and reasonable attorney fees and costs." Colo. Rev. Stat. Ann. § 6-1-113(2.9).

196.     The plaintiffs also seek an order on behalf of Colorado members of the class enjoining defendant's unfair and/or unconscionable act or practice, declaratory relief, attorneys' fees, and any other just and proper remedy under the Colorado CPA.

---

[69] Colo. Rev. Stat. § 6-1-105(1)(rrr).

## COUNT SEVEN

**VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT
CONN. GEN. STAT. § 42-110A, *ET SEQ.***

197.    The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

198.    This claim is brought on behalf of all Connecticut residents who are class members.

199.    The Connecticut Unfair Trade Practices Act (UTPA) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[70]

200.    Defendant is a "person" within the meaning of Conn. Gen. Stat. § 42-110a(3).

201.    AbbVie's challenged conduct occurred in the conduct of trade or commerce, within the meaning of Conn. Gen. Stat. § 42-110a(4).

202.    As alleged in this complaint, AbbVie's conduct with respect to Humira is "unfair" in violation of the UTPA.

203.    The Connecticut class members are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

204.    AbbVie acted with reckless indifference to another's rights or wanton or intentional violation of another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard for the rights and safety of others. Therefore, punitive damages are warranted for Connecticut class members.

---

[70] Conn. Gen. Stat. § 42-110b(a).

205.    The plaintiffs also seek an order on behalf of Connecticut class members enjoining AbbVie's unfair deceptive practices, attorneys' fees, and any other just and proper relief available under Conn. Gen. Stat. § 42-110g(d).

## COUNT EIGHT

### VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT
### DEL. CODE TIT. 6, § 2513, *ET SEQ.*

206.    The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

207.    This claim is brought on behalf of all Delaware residents who are class members.

208.    The Delaware class members and AbbVie are "persons" within the meaning of Del. Code tit. 6, § 2511(7).

209.    The Delaware Consumer Fraud Act (Delaware CFA) provides that any "unfair practice" is "unlawful."[71]

210.    The Delaware CFA defines "unfair practice" as "any act or practice that causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. In determining whether an act or practice is unfair, violations of public policy as established by law, regulation, or judicial decision applicable in this State may be considered as evidence of substantial injury."[72]

211.    AbbVie's conduct with respect to Humira are "unfair" practices under the Delaware CFA.

---

[71] Del. Code tit. 6, § 2513(a).
[72] *Id.* § 2511(9).

212.     The plaintiffs seek damages on behalf of Delaware class members under § 2525 of the Delaware CFA for injury resulting from the direct and natural consequences of AbbVie's unlawful conduct. The plaintiffs also seek an order on behalf of Delaware class members enjoining AbbVie's unfair acts and practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

213.     AbbVie engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages on behalf of Delaware class members.

## COUNT NINE

### VIOLATION OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT FLA. STAT. § 501.201, *ET SEQ.*

214.     The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

215.     This claim is brought on behalf of all Florida residents who are class members.

216.     The Florida Unfair and Deceptive Trade Practices Act (FUDTPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."[73]

217.     FUDTPA provides that "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2017."[74] The Legislature specifically stated that a violation of FUDTPA "may be based upon ... [t]he standards of unfairness ... set forth and interpreted by the Federal Trade Commission or the federal courts."[75]

---

[73] Fla. Stat. § 501.204(1).

[74] *Id.* § 501.204(2).

[75] *Id.* § 501.203(3)(b). 15 U.S.C. § 45(n) provides that an act or practice is "unfair" if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by

218.     In addition, AbbVie's conduct, as described in this complaint, constitutes "unfair" acts in violation of the FUDTPA.[76]

219.     The Florida class members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

220.     AbbVie's unfair acts and practices occurred in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

221.     The Florida Legislature has provided that a person who has suffered a loss as a result of a violation of FUDTPA may recover actual damages, plus attorneys' fees and court costs, all of which the plaintiffs seek in this action. The Florida class members are entitled to recover actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

222.     FUDTPA provides that "[a]nyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part."[77] The plaintiffs seek an order on behalf of Florida class members enjoining AbbVie's unfair acts and practices, declaratory relief, and any other just and proper relief available under the FUDTPA.

---

consumers themselves and not outweighed by countervailing benefits to consumers or to competition. In determining whether an act or practice is unfair, the Commission may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination."

[76] *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003) (defining an "unfair practice" under the FDUTPA as "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers" and noting a separate definition for "deception" (internal quotation marks and citation omitted)).

[77] Fla. Stat. § 501.211(1).

<u>COUNT TEN</u>

**VIOLATION OF THE HAWAII UNFAIR OR DECEPTIVE TRADE PRACTICES ACT
HAW. REV. STAT. §§ 480-1, *ET SEQ.***

223.    The plaintiffs incorporate by reference the allegations contained in the preceding

paragraphs of this complaint.

224.    This claim is brought on behalf of all Hawaii residents who are class members.

225.    Hawaii's Unfair or Deceptive Acts or Practices law (Hawaii UDAP) provides that

"unfair ... acts or practices in the conduct of any trade or commerce are unlawful."[78]

226.    AbbVie's conduct with respect to Humira constitutes "unfair" acts and practices

within the meaning of the Hawaii UDAP, which "shall be construed in accordance with judicial

interpretations of similar federal antitrust statutes, except that lawsuits by indirect purchasers may

be brought as provided in this chapter."[79]

227.    AbbVie's acts and practices, as set forth above, occurred in the conduct of trade or

commerce.

228.    Each Hawaii class member is a "consumer," and the Hawaii class members and

AbbVie are "persons," within the meaning of the Hawaii UDAP.[80]

---

[78] Haw. Rev. Stat. Ann. § 480-2(a).

[79] *Id.* § 480-3. *See Hungate v. L. Off. of David B. Rosen*, 139 Haw. 394, 411, 391 P.3d 1, 18 (2017) ("A practice 'is unfair when it [1] offends established public policy and [2] when the practice is immoral, unethical, oppressive, unscrupulous or [3] substantially injurious to consumers.' *Keka*, 94 Hawai'i at 228, 11 P.3d at 16 (citation omitted). Hungate need not allege that Deutsche Bank's actions meet all three of these factors to assert an unfair act or practice."). *Accord, Field v. NCAA*, 143 Haw. 362, 374, 431 P.3d 735, 747 (2018) (reversing summary judgment for NCAA). *See also State ex rel. Shikada v. Bristol-Myers Squibb Co.*, No. SCAP-21-0000363, 526 P.3d 395, 2023 WL 2519857, at *26 (Haw. Mar. 15, 2023) ("We clarify Hawai'i's unfair acts or practices UDAP test in one respect: meeting any one of the three criteria supports an unfair acts or practices UDAP claim.").

[80] *Id.* § 480-1.

229.     Each Hawaii class member is entitled to all monetary and injunctive relief allowed by the Hawaii UDAP.[81]

### COUNT ELEVEN

**VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT
IDAHO CODE ANN. § 48-601, *ET SEQ.***

230.     The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

231.     This claim is brought on behalf of all Idaho residents who are class members.

232.     The Idaho Consumer Protection Act (Idaho Act) provides that "[a]ny unconscionable method, act or practice in the conduct of any trade or commerce violates the provisions of this chapter whether it occurs before, during, or after the conduct of the trade or commerce."[82] The Idaho Act specifies what "circumstances shall be taken into consideration by the court" in determining whether acts or practices are unconscionable.[83]

233.     AbbVie's conduct with respect to Humira constitutes "unfair" acts and practices within the meaning of the Act.

---

[81] *Id.* § 480–13.

[82] Idaho Code Ann. § 48-603C(1).

[83] *Id.* § 48-603C(2). Those circumstances are: "(a) Whether the alleged violator knowingly or with reason to know, took advantage of a consumer reasonably unable to protect his interest because of physical infirmity, ignorance, illiteracy, inability to understand the language of the agreement or similar factor; (b) Whether, at the time the consumer transaction was entered into, the alleged violator knew or had reason to know that the price grossly exceeded the price at which similar goods or services were readily available in similar transactions by similar persons, although price alone is insufficient to prove an unconscionable method, act or practice; (c) Whether the alleged violator knowingly or with reason to know, induced the consumer to enter into a transaction that was excessively one-sided in favor of the alleged violator; (d) Whether the sales conduct or pattern of sales conduct would outrage or offend the public conscience, as determined by the court." *Id.*

234.    Idaho class members and AbbVie are "persons" within the meaning of the Idaho Act.[84]

235.    AbbVie's acts and practices, as set forth above, occurred in the conduct of trade or commerce, within the meaning of Idaho Code Ann. § 48-602(2).

236.    The Idaho class members are entitled to all monetary damages, restitution, and injunctive relief allowed by the Act, including penalties payable to elderly and disabled persons.[85]

<u>COUNT TWELVE</u>

**VIOLATION OF THE ILLINOIS CONSUMER FRAUD
AND DECEPTIVE BUSINESS PRACTICES ACT
815 ILL. COMP. STAT. 505/1, *ET SEQ.***

237.    The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

238.    This claim is brought on behalf of all Illinois residents who are class members.

239.    The Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA) prohibits "unfair or deceptive acts or practices... in the conduct of any trade or commerce ... whether any person has in fact been misled, deceived or damaged thereby."[86]

240.    That section also provides: "In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act."[87]

241.    AbbVie is a "person" as that term is defined in 815 Ill. Comp. Stat. 505/1(c).

---

[84] *Id.* § 48-602.
[85] *Id.* § 48-608.
[86] 815 Ill. Comp. Stat. 505/2.
[87] *Id.*

242.    Illinois class members are "consumers" as that term is defined in 815 Ill. Comp. Stat. 505/1(e).

243.    "To determine whether a practice is unfair, Illinois courts consider three factors: whether it 'offends public policy'; is 'immoral, unethical, oppressive, or unscrupulous'; or 'causes substantial injury to consumers.' ... A plaintiff need not satisfy all three factors; '[a] practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.'"[88] AbbVie's conduct, as described in this complaint, constitutes "unfair" acts and practices in violation of the ICFA under all three factors.[89]

244.    AbbVie's unfair acts and practices occurred in the conduct of trade or commerce, within the meaning of 815 Ill. Comp. Stat. Ann. 505/1(f).

245.    The ICFA allows "[a]ny person who suffers actual damage as a result of a violation of this Act committed by any other person [to] bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper ... ."[90] Pursuant to this provision of the code, the plaintiffs seek monetary relief against AbbVie on behalf of all Illinois class members for their actual damages, as well as punitive damages because AbbVie acted with fraud and/or malice and/or was grossly negligent.

246.    The plaintiffs also seek an order on behalf of all Illinois class members enjoining AbbVie's unfair acts and practices, attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. 505/1, *et seq.*

---

[88] *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738–39 (7th Cir. 2019) (citations omitted).

[89] *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010) (stating that "[a] plaintiff is entitled to recovery under ICFA when there is unfair or deceptive conduct" and "may allege that conduct is unfair ... without alleging that the conduct is deceptive").

[90] 815 Ill. Comp. Stat. 505/10a.

## COUNT THIRTEEN

### VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT
### KAN. STAT. § 50-623, *ET SEQ.*

247.     The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

248.     This claim is brought on behalf of all Kansas residents who are class members.

249.     The Kansas Consumer Protection Act (Kansas CPA) states "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction. An unconscionable act or practice violates this act whether it occurs before, during or after the transaction."[91] "The unconscionability of an act or practice is a question for the court."[92]

250.     Kansas class members are "consumers," within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased Humira.

251.     The sale of Humira to Kansas class members was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

252.     AbbVie's conduct, as described in this complaint, constitutes "unconscionable" acts and practices in violation of the Kansas CPA.

253.     Under Kan. Stat. Ann. § 50-634, the plaintiffs seek monetary relief on behalf of Kansas class members against AbbVie, measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each plaintiff.

---

[91] Kan. Stat. § 50-627(a).
[92] *Id.*, § 50-627(b).

254.     The plaintiffs also seek an order on behalf of Kansas class members enjoining AbbVie's unconscionable acts and practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann. § 50-623, *et seq.*

## COUNT FOURTEEN

**VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION LAW
LA. REV. STAT. § 51:1401, *ET SEQ.***

255.     The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

256.     This claim is brought on behalf of all Louisiana residents who are class members.

257.     The Louisiana Unfair Trade Practices and Consumer Protection Law (Louisiana CPL) makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce."[93]

258.     AbbVie and Louisiana class members are "persons" within the meaning of La. Rev. Stat. § 51:1402(8).

259.     Louisiana class members are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

260.     AbbVie's unfair acts and practices occurred in the conduct of trade or commerce, within the meaning of La. Rev. Stat. § 51:1402(10).

261.     AbbVie's conduct, as described in this complaint, constitutes unfair acts and practices in violation of the Louisiana CPL.[94]

---

[93] La. Rev. Stat. § 51:1405(A).
[94] *See Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc.*, 35 So. 3d 1053, 1059 (La. 2010) ("The courts have repeatedly held that, under this statute, the plaintiff must show the alleged conduct

262.    Pursuant to La. Rev. Stat. § 51:1409, the plaintiffs seek to recover actual damages on behalf of Louisiana class members in an amount to be determined at trial; treble damages for knowing violations of the Louisiana CPL; an order enjoining AbbVie's unfair acts and practices; declaratory relief; attorneys' fees; and any other just and proper relief available under La. Rev. Stat. § 51:1409.

**COUNT FIFTEEN**

**VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT
MD. COM. LAW CODE § 13-101, *ET SEQ.***

263.    The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

264.    This claim is brought on behalf of all Maryland residents who are class members.

265.    The Maryland Consumer Protection Act (Maryland CPA) provides that a person "may not engage in any unfair, abusive, or deceptive trade practice" in the sale of consumer goods.[95] The statute further provides that a person may not engage in such conduct regardless of whether the consumer is actually deceived or damaged.[96]

266.    AbbVie and Maryland class members are "persons" within the meaning of Md. Code, Com. Law § 13-101(h).

267.    AbbVie's conduct, as described in this complaint, constitutes "unfair" acts and practices in violation of the Maryland CPA.[97]

---

'offends established public policy and ... is immoral, unethical, oppressive, unscrupulous, or substantially injurious.'") (citation omitted).

[95] Md. Code, Com. Law § 13-303.

[96] *Id.* § 13-302.

[97] *See Sager v. Hous. Comm'n of Anne Arundel Cty.*, 957 F. Supp. 2d 627, 642 (D. Md. 2013) ("to be considered unfair under the MCPA, a trade practice must result in a: (1) substantial injury; (2) that is not outweighed by any countervailing benefits to the consumer or to competition that

268.    On behalf of Maryland class members, pursuant to Md. Code, Com. Law § 13-408, the plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

269.    The plaintiffs also seek an order on behalf of Maryland class members enjoining AbbVie's unfair acts and practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under Md. Code, Com. Law § 13-406.

**COUNT SIXTEEN**

**VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT
MO. REV. STAT. § 407.010, *ET SEQ.***

270.    The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

271.    This claim is brought on behalf of all Missouri residents who are class members.

272.    The Missouri Merchandising Practices Act (Missouri MPA) makes unlawful the "act, use or employment by any person of any ... unfair practice ... in connection with the sale or advertisement of any merchandise."[98]

273.    AbbVie and Missouri class members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

274.    AbbVie's conduct, as described in this complaint, constitutes "unfair" acts and practices in violation of the Missouri MPA.[99]

---

the practice produces; and (3) it must not be the type of injury that a consumer could reasonably have avoided") (citing *Legg v. Castruccio*, 100 Md. App. 748, 642 A.2d 906 (Md. Ct. Spec. App.1994)); *accord, Hibdon v. Safeguard Properties, LLC*, 2015 WL 4249525, at *4 (D. Md. July 9, 2015).

[98] Mo. Rev. Stat. § 407.020.1.

[99] *See* Mo. Code Regs. Ann. tit. 15, § 60-8.020(1) ("An unfair practice is any practice which−(A) Either−1. Offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or

275.     AbbVie's unfair acts and practices occurred in the conduct of trade or commerce, within the meaning of Mo. Rev. Stat. § 407.010(7).

276.     AbbVie is liable to the Missouri class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining AbbVie's unfair act and practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

<u>COUNT SEVENTEEN</u>

**VIOLATION OF THE MONTANA CONSUMER PROTECTION ACT
MONT. CODE ANN. § 30-14-101, *ET SEQ.***

277.     The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

278.     This claim is brought on behalf of all Montana residents who are class members.

279.     The Montana Consumer Protection Act (Montana Act) provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."[100]

280.     The Montana class members are "consumers" within the meaning of the Montana Act, and both those class members and AbbVie are "persons" within the meaning of the Montana Act.[101]

281.     AbbVie's conduct, as described in this complaint, constitutes "unfair" acts and practices in violation of the Montana Act.[102]

---

2. Is unethical, oppressive or unscrupulous; and (B) Presents a risk of, or causes, substantial injury to consumers.").
     [100] Mont. Code § 30-1-103.
     [101] *Id*. § 30-14-102(1), (6).
     [102] *See Young v. Era Advantage Realty*, 409 Mont. 234, 245, 513 P.3d 505, 513 (2022) ("An unfair trade practice is one that is 'contrary to established public policy *and* which is either immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.' *Anderson v.*

282.     AbbVie's unfair acts and practices occurred in the conduct of trade or commerce, within the meaning of Mont. Code § 30-14-102(8)(a).

283.     AbbVie is liable to the Montana class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and any other just and proper relief under Mont. Code § 30-14-133.

## COUNT EIGHTEEN

### VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT
### NEB. REV. STAT. ANN. § 59-1601, *ET SEQ.*

284.     The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

285.     This claim is brought on behalf of all Nebraska residents who are class members.

286.     The Nebraska Consumer Protection Act (Nebraska Act) provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful."[103]

287.     The Nebraska class members and AbbVie are "person" within the meaning of the Nebraska Act.

288.     AbbVie's conduct, as described in this complaint, constitutes "unfair" acts and practices in violation of the Nebraska Act.[104]

---

*ReconTrust Co., N.A.*, 2017 MT 313, ¶ 19, 390 Mont. 12, 407 P.3d 692 (emphasis in original) (citation and quotation omitted).").

[103] Neb. Rev. Stat. § 59-1602.

[104] *See* Neb. Rev. Stat. Ann. § 59-829 ("When any provision of ... Chapter 59 is the same as or similar to the language of a federal antitrust law, the courts of this state in construing such sections or chapter shall follow the construction given to the federal law by the federal courts."). The language of § 59-1602 is similar to 15 U.S.C. § 45(a)(1), so the standard in § 45(n), which is quoted above, applies.

289.    AbbVie's unfair acts and practices occurred in the conduct of trade or commerce, within the meaning of Neb. Rev. Stat. § 59-1601(2).

290.    AbbVie is liable to the Nebraska class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and any other just and proper relief under Neb. Rev. Stat. § 59–1609.

## COUNT NINETEEN

### VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT N.H. REV. STAT. ANN. § 358-A:1, *ET SEQ.*

291.    The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

292.    This claim is brought on behalf of all New Hampshire residents who are class members.

293.    The New Hampshire Consumer Protection Act (NH Act) provides that it "shall be unlawful for any person to use ... any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."[105]

294.    The New Hampshire class members and AbbVie are "person" within the meaning of the NH Act.[106]

295.    As alleged in this complaint, AbbVie's conduct with respect to Humira constitutes "unfair" acts and practices within the meaning of the NH Act, which provides that it "is the intent of the legislature that in any action or prosecution under this chapter, the courts may be guided by the interpretation and construction given Section 5(a)(1) of the Federal Trade Commission Act (15

---

[105] N.H. Rev. Stat. § 358-A:2.
[106] *Id.* § 358-A:1.

U.S.C. 45(a)(1)), by the Federal Trade Commission and the federal courts." N.H. Rev. Stat. § 358-A:13.[107]

296.    AbbVie's unfair acts and practices occurred in the conduct of trade or commerce, within the meaning of N.H. Rev. Stat. § 358-A:1(II).

297.    AbbVie is liable to the New Hampshire class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and any other just and proper relief under N.H. Rev. Stat. § 358-A:10, including injunctive relief.

## COUNT TWENTY

### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### N.J.S.A.56:8-1, *ET SEQ.*

298.    The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

299.    This claim is brought on behalf of all New Jersey residents who are class members.

300.    The New Jersey Consumer Fraud Act (NJCFA) makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice ... in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby ... ."[108]

---

[107] 15 U.S.C. § 45(n) provides that an act or practice is "unfair" if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. In determining whether an act or practice is unfair, the Commission may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination." *See State v. Priceline.com, Inc.*, 172 N.H. 28, 39, 206 A.3d 333, 343 (2019) (applying § 45(n) test).

[108] N.J. Stat. Ann. § 56:8-2.

301.    AbbVie and the New Jersey class members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

302.    AbbVie engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

303.    As described in this complaint, AbbVie's conduct constitutes "unconscionable" acts and practices in violation of the NJCFA.

304.    This unconscionable conduct by AbbVie, coupled with the damage the New Jersey class members incurred, entitles New Jersey class members to relief under the NJCFA. Section 19 of the Act provides a private right of action, with damages automatically trebled, to "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act ... ."[109] "In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, ... the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit."[110]

305.    Therefore, the New Jersey class members are entitled to recover legal and/or equitable relief, including an order enjoining unconscionable conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other appropriate relief.

---

[109] N.J. Stat. Ann. § 56:8-19.
[110] *Id.*

## COUNT TWENTY-ONE

### VIOLATION OF THE NORTH CAROLINA UNFAIR
### AND DECEPTIVE TRADE PRACTICES ACT
### N.C. GEN. STAT. § 75-1.1, *ET SEQ.*

306.    The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

307.    This claim is brought on behalf of all North Carolina residents who are class members.

308.    North Carolina's Unfair and Deceptive Acts and Practices Act (NCUDTPA) broadly prohibits "unfair or deceptive acts or practices in or affecting commerce."[111]

309.    AbbVie's conduct, as described in this complaint, constitutes "unfair" acts and practices in violation of the NCUDTPA.[112]

310.    AbbVie's unfair act and practices were in commerce and affected commerce, within the meaning of N.C. Gen. Stat. § 75-1.1(b).

311.    Section 75-16 of the NCUDTPA provides injured persons with a private right of action and automatic trebling of damages: "If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done,

---

[111] N.C. Gen. Stat. § 75-1.1(a).

[112] *See Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 91, 747 S.E.2d 220, 228 (2013) ("'A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers....'") (quoting *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 72, 653 S.E.2d 393, 399 (2007)).

and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against [AbbVie] for treble the amount fixed by the verdict."[113]

312.    The North Carolina class members are entitled to damages and treble damages, an order enjoining AbbVie's unconscionable acts and practices, costs of Court, attorney's fees, and any other just and proper relief available under N.C. Gen. Stat. § 75-16.

## COUNT TWENTY-TWO

### VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT
### N.D. CENT. CODE § 51-15-02

313.    The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

314.    This claim is brought on behalf of all North Dakota residents who are class members.

315.    The North Dakota Consumer Fraud Act (North Dakota CFA) makes unlawful the "act, use, or employment by any person of any act or practice, in connection with the sale or advertisement of any merchandise, which is unconscionable or which causes or is likely to cause substantial injury to a person which is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition, is declared to be an unlawful practice."[114]

316.    AbbVie and North Dakota class members are "persons" within the meaning of N.D. Cent. Code § 51-15-02(4).

---

[113] N.C. Gen. Stat. § 75-16.
[114] *Id.*

317.     AbbVie engaged in the "sale" of "merchandise" within the meaning of N.D. Cent. Code § 51-15-02(3), (5).

318.     As described in this complaint, AbbVie's conduct caused North Dakota class members to suffer substantial injury that they could not reasonably avoid and which was not outweighed by countervailing benefits to consumers or to competition.

319.     AbbVie knowingly committed the conduct described above. As a result, under N.D. Cent. Code § 51-15-09, it is liable to the North Dakota class members for treble damages in amounts to be proven at trial, attorneys' fees, costs, and disbursements. The plaintiffs further seek an order on behalf of North Dakota class members enjoining AbbVie's unlawful acts and practices as well as all other just and proper available relief under the North Dakota CFA.

## COUNT TWENTY-THREE

### VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT
### OKLA. STAT. TIT. 15, § 751, *ET SEQ.*

320.     The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

321.     This claim is brought on behalf of all Oklahoma residents who are class members.

322.     The Oklahoma Consumer Protection Act (Oklahoma CPA) provides that a "person engages in a practice which is declared to be unlawful under the Oklahoma Consumer Protection Act when, in the course of the person's business, the person: ... (20) Commits an unfair or deceptive trade practice as defined in Section 752 of this title ... ."[115] Under section 752, "'Unfair

---

[115] Okla. Stat. tit. 15, § 753(2).

trade practice' means any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers...."[116]

323.     The Oklahoma class members are "persons" under Okla. Stat. tit. 15, § 752.

324.     AbbVie is a "person," "corporation," or "association" within the meaning of Okla. Stat. tit. 15, § 15-751(1).

325.     The sale of Humira to the Oklahoma class members was a "consumer transaction" within the meaning of Okla. Stat. tit. 15, § 752, and AbbVie's actions as set forth herein occurred in the course of its business.

326.     AbbVie's conduct, as described in this complaint, constitutes an "unfair trade practice" in violation of the Oklahoma CPA.

327.     Because AbbVie's unfair conduct caused injury to Oklahoma class members, the plaintiffs seek recovery on behalf of Oklahoma class members of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees under Okla. Stat. tit. 15, § 761.1. The plaintiffs further seek an order on behalf of Oklahoma class members enjoining AbbVie's unfair trade practices and any other just and proper relief available under the Oklahoma CPA.

328.     The plaintiffs also seek punitive damages on behalf of Oklahoma class members because AbbVie's conduct was egregious. AbbVie inflated Humira's list prices and concealed the reasons for and amount of the rebates offered to PBMs to increase their profits at the expense of consumers. It manipulated the prices of Humira without regard to the impact of its scheme on consumers, warranting punitive damages.

---

[116] *Id.* § 752(14).

## COUNT TWENTY-FOUR

### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES
### AND CONSUMER PROTECTION LAW
### 73 P.S. § 201-1, *ET SEQ.*

329. The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

330. This claim is brought on behalf of all Pennsylvania residents who are class members.

331. The Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL) provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of clause (4) of section 21 of this act and regulations promulgated under section 3.1 of this act are hereby declared unlawful."[117]

332. The Pennsylvania class members and AbbVie are "persons" within the meaning of the UTPCPL.[118]

333. As alleged in this complaint, AbbVie's conduct with respect to Humira constitutes "unfair" acts and practices within the meaning of the UTPCPL.[119]

---

[117] 73 P.S. § 201-3(a).

[118] *Id.*, § 201-2.

[119] *See Telebrands Corp. v. VindEx Sols. LLC*, 2022 WL 1062051, at *7 (N.D. Cal. Apr. 8, 2022) (in determining whether an act of practice is unfair under Pennsylvania law, "courts consider factors including "(1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise – whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous, (3) whether it causes substantial injury to consumers (or competitors or other businessmen)'") (quoting *Com. Ex rel. Zimmerman v. Nickel*, 26 Pa. D. & C. 3d 115, 120–21 (C.P. 1983); *Westfield Grp. v. Campisi*, 2006 WL 328415, at *18 (W.D. Pa. Feb. 10, 2006) ("And an act or practice need not be proven to be deceptive in order to be declared 'unfair'—which necessarily involves consideration of a variety of factors including whether the practice causes substantial injury to consumers or others.").

334.    AbbVie's unfair acts and practices occurred in the conduct of trade or commerce, within the meaning of 73 P.S. § 201-2(3).

335.    AbbVie is liable to the Pennsylvania class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, along with any other just and proper relief under 73 P.S. § 201-9.2.

## COUNT TWENTY-FIVE

### VIOLATION OF THE RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT
### 6 R.I. GEN. LAWS ANN. § 6-13.1-1, *ET SEQ.*

336.    The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

337.    This claim is brought on behalf of all Rhode Island residents who are class members.

338.    The Rhode Island Deceptive Trade Practices Act (Rhode Island Act) provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful."[120]

339.    The Rhode Island class members and AbbVie are "persons" within the meaning of the Rhode Island Act.[121]

340.    As alleged in this complaint, AbbVie's conduct with respect to Humira constitutes "unfair" acts and practices within the meaning of the Rhode Island Act.[122]

---

[120] R.I. Gen. Laws § 6-13.1-2.

[121] *Id.*, § 201-2.

[122] *Long v. Dell, Inc.*, 93 A.3d 988, 1000 (R.I. 2014) ("To determine whether a trade practice is 'unfair' under the DTPA, this Court has stated that the following factors apply: '(1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes

341.     AbbVie's unfair acts and practices occurred in the conduct of trade or commerce, within the meaning of R.I. Gen. Laws § 6-13.1-1(5).

342.     AbbVie is liable to the Rhode Island class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, along with any other just and proper relief under R.I. Gen. Laws § 6-13.1–5.2.

## COUNT TWENTY-SIX

### VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
### S.C. CODE ANN. § 39-5-10, *ET SEQ.*

343.     The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

344.     This claim is brought on behalf of all South Carolina residents who are class members.

345.     The South Carolina Unfair Trade Practices Act (South Carolina UTPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."[123]

346.     AbbVie is a "person" under S.C. Code Ann. § 39-5-10.

347.     AbbVie's conduct, as described in this complaint, constitutes "unfair" acts and practices in violation of the South Carolina UTPA, which provides that "the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to Section

---

substantial injury to consumers (or competitors or other businessmen)."'"). *See id.* at 1000 n.12 ("What effect the FTC's 1980 policy statement and 15 U.S.C. § 45(n) have on the unfairness analysis is not before us.").

[123] S.C. Code Ann. § 39-5-20(a).

5(a) (1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended." S.C. Code § 39-5-20(b).[124]

348.    AbbVie's unfair acts and practices occurred in the conduct of trade or commerce, within the meaning of S.C. Code Ann. § 39-5-10(b).

349.    Pursuant to S.C. Code Ann. § 39-5-140(a), the plaintiffs seek monetary relief on behalf of South Carolina class members to recover their economic losses. Because AbbVie's actions were willful and knowing, the damages should be trebled.

350.    The plaintiffs further allege on behalf of South Carolina class members that AbbVie's malicious and deliberate conduct warrants an assessment of punitive damages because it carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting the South Carolina class members to cruel and unjust hardship as a result. AbbVie unfairly inflated its list prices and concealed the reasons for and amount of the rebates offered to PBMs to increase its profits at the expense of consumers. And it manipulated the prices of its product without regard to the impact of its scheme on consumers' ability to afford medicines. Its unfair conduct warrants punitive damages.

351.    The plaintiffs further seek an order on behalf of South Carolina class members enjoining AbbVie's unfair acts and practices.

---

[124] *See Upstate Plumbing, Inc. v. AAA Upstate Plumbing of Greenville, LLC*, 2018 WL 1471908, at *6 (D.S.C. Mar. 26, 2018) (in case brought pursuant to South Carolina UTPA, court applied test under 15 U.S.C. § 45(n)).

## COUNT TWENTY-SEVEN

### VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT
### TENN. CODE ANN. § 47-18-101, *ET SEQ.*

352. The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

353. This claim is brought on behalf of all Tennessee residents who are class members.

354. Tennessee Consumer Protection Act (Tennessee CPA) prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce."[125] Moreover, it "is the intent of the general assembly that this part shall be interpreted and construed consistently with the interpretations given by the federal trade commission and the federal courts pursuant to § 5(A)(1) of the Federal Trade Commission Act, codified in 15 U.S.C. § 45(a)(1)."[126]

355. The Tennessee class members are "natural persons" and "consumers" within the meaning of Tenn. Code Ann. § 47-18-103(2).

356. AbbVie is a "person" within the meaning of Tenn. Code Ann. § 47-18-103(2).

357. AbbVie's conduct complained of herein affected "trade," "commerce," or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(19).

358. AbbVie's conduct, as described in this complaint, constitutes "unfair acts" in violation of the Tennessee CPA.

---

[125] Tenn. Code Ann. § 47-18-104.

[126] *Id.* § 47-18-115. 15 U.S.C. § 45(n) provides that an act or practice is "unfair" if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. In determining whether an act or practice is unfair, the Commission may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination."

359.     On behalf of Tennessee class members, pursuant to Tenn. Code Ann. § 47-18-109(a), the plaintiffs seek monetary relief against AbbVie, measured as actual damages in an amount to be determined at trial, treble damages as a result of AbbVie's willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

### COUNT TWENTY-EIGHT

### VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES CONSUMER PROTECTION ACT
### TEX. BUS. & COM. CODE § 17.41, *ET SEQ.*

360.     The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

361.     This claim is brought on behalf of all Texas residents who are class members.

362.     Each Texas class member is a "consumer" within the meaning of the Texas Deceptive Trade Practices-Consumer Protection Act (TDTPA).[127] AbbVie is a "person" within the meaning of the TDTPA.[128]

363.     The TDTPA provides that a "consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish: ... (3) any unconscionable action or course of action by any person...."[129]

364.     The TDTPA defines an "[u]nconscionable action or course of action" as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."[130] The Texas courts further

---

[127] *See* Tex. Bus. & Com. Code § 17.45(4).
[128] *Id.* § 17.45(3).
[129] *Id.* § 17.50(a)(3).
[130] *Id.* § 17.45(5).

define an unconscionable act as "one that takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a 'grossly unfair degree,' or which results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration."[131]

365.     As alleged in this complaint, AbbVie engaged in unconscionable actions in violation of the TDTPA.

366.     Pursuant to Tex. Bus. & Com. Code § 17.50(a)(1) and (b), the plaintiffs seek monetary relief against AbbVie on behalf of the Texas class members, measured as actual damages in an amount to be determined at trial, treble damages for AbbVie's knowing violations of the TDTPA, and any other just and proper relief available under the TDTPA.

367.     Alternatively, or additionally, pursuant to Tex. Bus. & Com. Code § 17.50(b)(3) & (4), the Texas class members who purchased Humira are entitled to disgorgement or to rescission or to any other relief necessary to restore any money or property that was acquired from them based on AbbVie's violations of the TDTPA.

368.     The Texas class members are also entitled to recover court costs and reasonable and necessary attorneys' fees under § 17.50(d) of the TDTPA.

---

[131] *Brennan v. Manning*, No. 07-06-0041-CV, 2007 WL 1098476, at *5 (Tex. App. Apr. 12, 2007); *see also Lon Smith & Assocs., Inc. v. Key*, 527 S.W.3d 604, 623, 2017 WL 3298391, at *11 (Tex. Ct. App. Aug 3, 2017) ("The DTPA defines '[u]nconscionable action or course of action' as 'an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree.'" (quoting Tex. Bus. & Comm. Code Ann. § 17.45(5))); *Robinson v. Match.com, L.L.C.*, 3:10-CV-2651-L, 2012 WL 5007777, at *4 (N.D. Tex. Oct. 17, 2012), *aff'd sub nom. Malsom v. Match.com, L.L.C.*, 540 F. App'x 412 (5th Cir. 2013); *McPeters v. LexisNexis*, 910 F. Supp. 2d 981, 988 (S.D. Tex. 2012).

369.    On April 19, 2023, the plaintiffs sent a letter to AbbVie, complying g with Tex. Bus. & Com. Code § 17.505(a). Pursuant to § 17:505(d) suit is filed now to protect any argument regarding the statute of limitations.

## COUNT TWENTY-NINE

### VIOLATION OF THE UTAH CONSUMER SALE PRACTICES ACT
### UTAH CODE § 13-11-1, *ET SEQ.*

370.    The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

371.    This claim is brought on behalf of all Utah residents who are class members.

372.    The Utah Consumer Sales Practices Act (Utah CSPA) makes unlawful an "unconscionable act or practice by a supplier in connection with a consumer transaction."[132] "The unconscionability of an act or practice is a question of law for the court. If it is claimed or appears to the court that an act or practice may be unconscionable, the parties shall be given a reasonable opportunity to present evidence as to its setting, purpose, and effect to aid the court in making its determination."[133] "In determining whether an act or practice is unconscionable, the court shall consider circumstances which the supplier knew or had reason to know."[134]

373.    As alleged in this complaint, AbbVie engaged in unconscionable acts and practices in violation of the Utah CSPA. Each class member entered into a "consumer transaction" regarding Humira, as defined by the Utah CSPA.[135]

---

[132] Utah Code § 13-11-5(1).
[133] *Id.* § 13-11-5(2).
[134] *Id.* § 13-11-5(3).
[135] *Id.* § 13-11-3(2)(a).

374.    Pursuant to Utah Code Ann. § 13-11-4, the plaintiffs seek the following relief on behalf of the Utah class members: monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each class member; reasonable attorneys' fees; and any other just and proper relief available under the Utah CSPA.

## COUNT THIRTY

**VIOLATION OF THE VERMONT CONSUMER FRAUD ACT**
**VT. STAT. ANN. TIT. 9, § 2451, *ET SEQ.***

375.    The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

376.    This claim is brought on behalf of all Vermont residents who are class members.

377.    The Vermont Consumer Fraud Act (Vermont Act) provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful."[136]

378.    The Vermont class members and AbbVie are "consumers" within the meaning of the Vermont Act, and AbbVie is a "seller" within the meaning of that Act.[137]

379.    As alleged in this complaint, AbbVie's conduct with respect to Humira constitutes "unfair" acts and practices in commerce within the meaning of the Vermont Act.[138]

---

[136] Vt. Stat. Ann. tit. 9, § 2453(a).

[137] *Id.*, § 2451a.

[138] *See Christie v. Dalmig, Inc.*, 136 Vt. 597, 601, 396 A.2d 1385, 1388 (1979) (in assessing unfairness under Vermont Act, Supreme Court applied test of "'(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to consumers … .'") (quoting *F.T.C. v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972)).

380.     AbbVie is liable to the Vermont class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, along with any other just and proper relief under Vt. Stat. Ann. tit. 9, § 2464c.

## COUNT THIRTY-ONE

### VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT
### WASH. REV. CODE ANN. § 19.86.010, *ET SEQ.*

381.     The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

382.     This claim is brought on behalf of all Washington residents who are class members.

383.     The Washington Consumer Protection Act (Washington Act) provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."[139]

384.     The Washington class members and AbbVie are "persons" within the meaning of the Vermont Act.[140]

385.     As alleged in this complaint, AbbVie's conduct with respect to Humira constitutes "unfair" acts and practices within the meaning of the Washington Act. [141]

---

[139] Wash. Rev. Code § 19.86.020.

[140] *Id.*, § 19.86.010.

[141] *See Gray v. Amazon.com, Inc.*, No. 2:22-cv-800-BJR, 2023 WL 1068513, at *7 (W.D. Wash. Jan. 27, 2023) ("It is possible that an act or practice is 'unfair without being deceptive.' *Klem v. Washington Mut. Bank*, 176 Wash. 2d 771, 786, 295 P.3d 1179 (2013). To prevail on such a theory, the plaintiff must establish that the act or practice 'causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and is not outweighed by countervailing benefits [to consumers or to competition].' *Alpert v. Nationstar Mortg. LLC*, No. 15-cv-1164, 2019 WL 1200541, at *6 (W.D. Wash. Mar. 14, 2019) (quoting Klem, 176 Wash. 2d at 786, 295 P.3d 1179)."). *Accord, Domain Name Comm'n Ltd. v. DomainTools*, LLC, 449 F. Supp. 3d 1024, 1032 (W.D. Wash. 2020).

386.     AbbVie's unfair acts and practices occurred in the conduct of trade or commerce, within the meaning of Wash. Rev. Code § 19.86.010(2).

387.     AbbVie is liable to the Washington class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, along with any other just and proper relief under Wash. Rev. Code § 19.86.090, including injunctive relief.

## COUNT THIRTY-TWO

### VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT
### WYO. STAT. ANN. § 40-12-101, *ET SEQ.*

388.     The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

389.     This claim is brought on behalf of all Wyoming residents who are class members.

390.     The Wyoming Consumer Protection Act (WCPA) prohibits, "in the course of [a person's] business and in connection with a consumer transaction," any "unfair or deceptive acts or practices...."[142]

391.     The Wyoming class members and AbbVie are "persons" within the meaning of the WCPA.[143] And AbbVie's conduct, as alleged above, was in it the course of its business and in connection with "consumer transactions" within the meaning of the WCPA.[144]

392.     As alleged in this complaint, AbbVie's conduct with respect to Humira constitutes "unfair" acts and practices within the meaning of the WCPA.[145]

---

[142] Wyo. Stat. § 40-12-105(a)(xv).

[143] *Id.*, § 40-12-102(a)(i).

[144] *Id.*, § 40-12-102(a)(ii).

[145] *See WyoLaw, LLC v. Off. of Att'y Gen., Consumer Prot. Unit*, 486 P.3d 964, 972 (Wyo. 2021) ("[The WCPA] includes a general prohibition on 'unfair or deceptive acts or practices.' § 40-12-105(a)(xv). 'Although the WCPA does not define these terms, a "deceptive practice" has broadly been understood as one that is likely to mislead consumers, and an "unfair practice" as one that

393.    AbbVie is liable to the class members for damages in amounts to be proven at trial, including attorneys' fees and costs, along with any other just and proper relief under Wyo. Stat. § 40-12-108.

394.    On April 19, 2023, the plaintiffs sent a letter to AbbVie, complying with Wyo. Stat. Ann. § 40-12-109. Because AbbVie failed to remedy its unlawful conduct within the requisite period, the plaintiffs seek all damages and relief to which Wyoming class members are entitled *See* Wyo. Stat. Ann. § 40-12-109 ("No action may be brought under this act, except under W.S. 40-12-106, unless the consumer bringing the action gives within the following time limits notice in writing to the alleged violator of the act, (a) within one (1) year after the initial discovery of the unlawful deceptive trade practice, (b) within two (2) years following such consumer transaction, whichever occurs first, and unless the unlawful deceptive trade practice becomes an uncured unlawful deceptive trade practice as defined in this act. The notice required under this section shall state fully the nature of the alleged unlawful deceptive trade practice and the actual damage suffered therefrom. No action may be brought under this act, except under W.S. 40-12-106, unless said action is initiated within one (1) year after the furnishing of notice as required under this section."

## DEMAND FOR JUDGMENT

WHEREFORE, the plaintiffs, on behalf of themselves and the proposed class, respectfully demand that this Court:

---

offends established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.' *Nicklas v. Pro. Assistance, LLC*, No. 18-CV-0066-SWS, 2018 WL 8619646, at *3 (D. Wyo. Sept. 26, 2018) (quoting 152 Am. Jur. Proof of Facts 3d 409 § 11 (2016))....").

A.      Determine that this action may be maintained as a class action under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), and direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to any class certified under Rule 23(b)(3), and declare the plaintiffs as the representatives of the certified class;

B.      Enter judgment against AbbVie and in favor of the plaintiffs and the class;

C.      Award the plaintiffs and the class damages, including treble damages and punitive damages if authorized by law, in an amount to be determined at trial;

D.      Award the plaintiffs and the class their costs of suit, including reasonable attorneys' fees as provided by law;

E.      Enjoin AbbVie from continuing to report artificially inflated list prices that do not approximate its true net prices; and

F.      Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, the plaintiffs, on behalf of themselves and the proposed class, demand a trial by jury on all issues so triable.

Dated: July 21, 2023        Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Steve W. Berman*
      Steve W. Berman (#3126833)
Craig R. Spiegel (#3128238)
1301 Second Ave., Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:   (206) 623-0594
steve@hbsslaw.com
craigs@hbsslaw.com

Mark T. Vazquez (#6310387)
Whitney K. Siehl (#6313995)
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. CityFront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4962
Facsimile:   (708) 628-4950
markv@hbsslaw.com
whitneys@hbsslaw.com

Thomas M. Sobol (*pro hac vice* to be applied for)
Hannah W. Brennan (*pro hac vice* to be applied for)
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile:   (617) 482-3003
tom@hbsslaw.com
hannahb@hbsslaw.com

James E. Cecchi (*pro hac vice* to be applied for)
Donald A. Ecklund (*pro hac vice* to be applied for)
CARELLA BYRNE CECCHI BRODY AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile:   (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com

Joseph H. Meltzer (*pro hac vice* to be applied for)
Terence S. Ziegler (*pro hac vice* to be applied for)
Ethan J. Barlieb (*pro hac vice* to be applied for)
Lisa Lamb Port (#91722)
KESSLER TOPAZ MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
jmeltzer@ktmc.com
tziegler@ktmc.com
ebarlieb@ktmc.com
llambport@ktmc.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on July 28, 2023, I caused the foregoing FIRST AMENDED CLASS ACTION COMPLAINT to be filed by using the Court's CM/ECF system, which will cause notice to be sent to all counsel of record.

/s/ Steve W. Berman
Steve W. Berman (#3126833)